# MITCHELL *v.* FORSYTH

No. 84–335.   Argued February 27, 1985—Decided June 19, 1985

512

WHITE, J., delivered the opinion of the Court, in which BLACKMUN, J., joined; in Parts I, III, and IV of which BURGER, C. J., and O'CONNOR, J., joined; and in Parts I and II of which BRENNAN and MARSHALL, JJ., joined. BURGER, C. J., filed an opinion concurring in part, *post*, p. 536. O'CONNOR, J., filed an opinion concurring in part, in which BURGER, C. J., joined, *post*, p. 537. STEVENS, J., filed an opinion concurring in the judgment, *post*, p. 538. BRENNAN, J., filed an opinion concurring in part and dissenting in part, in which MARSHALL, J., joined, *post*, p. 543. POWELL, J., took no part in the decision of the case. REHNQUIST, J., took no part in the consideration or decision of the case.

*Deputy Solicitor General Bator* argued the cause for petitioner. With him on the briefs were *Solicitor General Lee, Acting Assistant Attorney General Willard, Samuel A. Alito, Jr., Barbara L. Herwig, Gorden W. Daiger,* and *Larry L. Gregg.*

*David Rudovsky* argued the cause for respondent. With him on the brief was *Michael Avery*.

JUSTICE WHITE delivered the opinion of the Court.

This is a suit for damages stemming from a warrantless wiretap authorized by petitioner, a former Attorney General of the United States. The case presents three issues: whether the Attorney General is absolutely immune from suit for actions undertaken in the interest of national security; if not, whether the District Court's finding that petitioner is not immune from suit for his actions under the qualified immunity standard of *Harlow* v. *Fitzgerald,* 457 U. S. 800 (1982), is appealable; and, if so, whether the District Court's ruling on qualified immunity was correct.

## I

In 1970, the Federal Bureau of Investigation learned that members of an antiwar group known as the East Coast Conspiracy to Save Lives (ECCSL) had made plans to blow up heating tunnels linking federal office buildings in Washington, D. C., and had also discussed the possibility of kidnaping then National Security Adviser Henry Kissinger. On November 6, 1970, acting on the basis of this information, the then Attorney General John Mitchell authorized a warrantless wiretap on the telephone of William Davidon, a Haverford College physics professor who was a member of the group. According to the Attorney General, the purpose of the wiretap was the gathering of intelligence in the interest of national security.

The FBI installed the tap in late November 1970, and it stayed in place until January 6, 1971. During that time, the Government intercepted three conversations between Davidon and respondent Keith Forsyth. The record before us does not suggest that the intercepted conversations, which appear to be innocuous, were ever used against Forsyth in any way. Forsyth learned of the wiretap in 1972, when, as a criminal defendant facing unrelated charges, he moved under

18 U. S. C. § 3504 for disclosure by the Government of any electronic surveillance to which he had been subjected. The Government's response to Forsyth's motion revealed that although he had never been the actual target of electronic surveillance, he "did participate in conversations that are unrelated to this case and which were overheard by the Federal Government during the course of electronic surveillance expressly authorized by the President acting through the Attorney General." App. 20–21. The Government's response was accompanied by an affidavit, sworn to by then Attorney General Richard Kleindienst, averring that the surveillance to which Forsyth had been subjected was authorized "in the exercise of [the President's] authority relating to the national security as set forth in 18 U. S. C. 2511(3)." *Id.*, at 23.[1]

Shortly thereafter, this Court ruled that the Fourth Amendment does not permit the use of warrantless wiretaps

---

[1] Title 18 U. S. C. § 2511(3) (1976 ed.) provided:

"Nothing contained in this chapter or in section 605 of the Communications Act of 1934 (48 Stat. 1143; 47 U. S. C. 605) shall limit the constitutional power of the President to take such measures as he deems necessary to protect the Nation against actual or potential attack or other hostile acts of a foreign power, to obtain foreign intelligence information deemed essential to the security of the United States, or to protect national security information against foreign intelligence activities. Nor shall anything contained in this chapter be deemed to limit the constitutional power of the President to take such measures as he deems necessary to protect the United States against the overthrow of the Government by force or other unlawful means, or against any other clear and present danger to the structure or existence of the Government. The contents of any wire or oral communication intercepted by authority of the President in the exercise of the foregoing powers may be received in evidence in any trial hearing, or other proceeding only where such interception was reasonable, and shall not be otherwise used or disclosed except as is necessary to implement that power" (footnote omitted).

The provision, enacted as part of Title III of the Omnibus Crime Control and Safe Streets Act of 1968, was repealed in 1978 by § 201(c) of the Foreign Intelligence Surveillance Act, Pub. L. 95–511, 92 Stat. 1797.

in cases involving domestic threats to the national security. *United States* v. *United States District Court,* 407 U. S. 297 (1972) *(Keith).* In the wake of the *Keith* decision, Forsyth filed this lawsuit against John Mitchell and several other defendants in the United States District Court for the Eastern District of Pennsylvania. Forsyth alleged that the surveillance to which he had been subjected violated both the Fourth Amendment and Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U. S. C. §§ 2510–2520, which sets forth comprehensive standards governing the use of wiretaps and electronic surveillance by both governmental and private agents. He asserted that both the constitutional and statutory provisions provided him with a private right of action; he sought compensatory, statutory, and punitive damages.

Discovery and related preliminary proceedings dragged on for the next five-and-a-half years. By early 1978, both Forsyth and Mitchell had submitted motions for summary judgment on which the District Court was prepared to rule. Forsyth contended that the uncontested facts established that the wiretap was illegal and that Mitchell and the other defendants were not immune from liability; Mitchell contended that the decision in *Keith* should not be applied retroactively to the wiretap authorized in 1970 and that he was entitled either to absolute prosecutorial immunity from suit under the rule of *Imbler* v. *Pachtman,* 424 U. S. 409 (1976), or to qualified or "good faith" immunity under the doctrine of *Wood* v. *Strickland,* 420 U. S. 308 (1975).

The court found that there was no genuine dispute as to the facts that the FBI had informed Mitchell of the ECCSL's plots, that Mitchell had authorized the warrantless tap on Davidon's phone, and that the ostensible purpose of the tap was the gathering of intelligence in the interest of national security. Such a wiretap, the court concluded, was a clear violation of the Fourth Amendment under *Keith,* which, in

the court's view, was to be given retroactive effect. The court also rejected Mitchell's claim to absolute immunity from suit under *Imbler* v. *Pachtman: Imbler*, the court held, provided absolute immunity to a prosecutor only for his acts in "initiating and pursuing a criminal prosecution"; Mitchell's authorization of the wiretap constituted the performance of an investigative rather than prosecutorial function. *Forsyth* v. *Kleindienst*, 447 F. Supp. 192, 201 (1978). Although rejecting Mitchell's claim of absolute immunity, the court found that Mitchell was entitled to assert a qualified immunity from suit and could prevail if he proved that he acted in good faith. Applying this standard, with its focus on Mitchell's state of mind at the time he authorized the wiretap, the court concluded that neither side had met its burden of establishing that there was no genuine issue of material fact as to Mitchell's good faith. Accordingly, the court denied both parties' motions for summary judgment. *Id.*, at 203.

Mitchell appealed the District Court's denial of absolute immunity to the United States Court of Appeals for the Third Circuit, which remanded for further factfinding on the question whether the wiretap authorization was "necessary to [a] . . . decision to initiate a criminal prosecution" and thus within the scope of the absolute immunity recognized in *Imbler* v. *Pachtman*. *Forsyth* v. *Kleindienst*, 599 F. 2d 1203, 1217 (1979). On remand, the District Court held a hearing on the question whether the wiretap served a prosecutorial purpose. On the basis of the hearing and the evidence in the record, the court concluded that Mitchell's authorization of the wiretap was not intended to facilitate any prosecutorial decision or further a criminal investigation. Mitchell himself had disavowed any such intention and insisted that the only reason for the wiretap was to gather intelligence needed for national security purposes. Taking Mitchell at his word in this regard, the court held to its conclusion that he was not entitled to absolute prosecutorial immunity.

At the same time, the court reconsidered its ruling on qualified immunity in light of *Harlow* v. *Fitzgerald*, 457 U. S. 800 (1982), in which this Court purged qualified immunity doctrine of its subjective components and held that "government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.*, at 818. The District Court rejected Mitchell's argument that under this standard he should be held immune from suit for warrantless national security wiretaps authorized before this Court's decision in *Keith:* that decision was merely a logical extension of general Fourth Amendment principles and in particular of the ruling in *Katz* v. *United States*, 389 U. S. 347 (1967), in which the Court held for the first time that electronic surveillance unaccompanied by physical trespass constituted a search subject to the Fourth Amendment's warrant requirement. Mitchell and the Justice Department, the court suggested, had chosen to "gamble" on the possibility that this Court would create an exception to the warrant requirement if presented with a case involving national security. Having lost the gamble, Mitchell was not entitled to complain of the consequences.[2] The court therefore denied Mitchell's motion for summary judgment, granted Forsyth's motion for summary judgment on the issue of liability, and scheduled further proceedings on the issue of damages. *Forsyth* v. *Kleindienst*, 551 F. Supp. 1247 (1982).

Mitchell again appealed, contending that the District Court had erred in its rulings on both absolute immunity and qualified immunity. Holding that it possessed jurisdiction to decide the denial of absolute immunity issue despite the fact

---

[2] The court also suggested that Mitchell should have been put on notice that his act was unlawful by Title III, which, in its view, clearly proscribed such warrantless wiretaps.

that it was a pretrial order and arguably not a final judgment,[3] the Court of Appeals rejected Mitchell's argument that the national security functions of the Attorney General entitled him to absolute immunity under *Imbler* v. *Pachtman* or otherwise. With respect to the denial of qualified immunity, the Court of Appeals held that the District Court's order was not appealable under the collateral order doctrine of *Cohen* v. *Beneficial Industrial Loan Corp.*, 337 U. S. 541 (1949). Fearing that allowing piecemeal appeals of such issues would unduly burden appellate courts, the court was unwilling to hold that the goal of protecting officials against frivolous litigation required that orders denying qualified immunity be immediately appealable. Forsyth's claim, the court noted, was not a frivolous one, and the policies underlying the immunity doctrine would therefore not be frustrated if Mitchell were forced to wait until final judgment to appeal the qualified immunity ruling.[4] *Forsyth* v. *Kleindienst*, 729

---

[3] Forsyth had moved for dismissal of the appeal on the ground that it was interlocutory and therefore not within the Court of Appeals' jurisdiction under 28 U. S. C. § 1291. A motions panel of the Third Circuit held that the denial of absolute immunity was an appealable order under *Nixon* v. *Fitzgerald*, 457 U. S. 731 (1982), and that the issue of the appealability of a denial of qualified immunity was debatable enough to justify referring it to the merits panel. *Forsyth* v. *Kleindienst*, 700 F. 2d 104 (1983). Judge Sloviter dissented, arguing that Mitchell's arguments regarding absolute immunity were frivolous in light of the Third Circuit's earlier consideration of the same issue. In addition, Judge Sloviter argued that a denial of qualified immunity—unlike a denial of absolute immunity—was not immediately appealable under the collateral order doctrine of *Cohen* v. *Beneficial Industrial Loan Corp.*, 337 U. S. 541 (1949), because the issue of objective good faith was neither separate from the merits of the underlying action nor effectively unreviewable on appeal from a final judgment.

[4] Judge Weis, dissenting, argued that the point of the immunity doctrine was protecting officials not only from ultimate liability but also from the trial itself, and that the vindication of this goal required immediate appeal. On the merits, Judge Weis would have reversed the District Court's immunity ruling on the ground that until *Keith* was decided it was not clearly

F. 2d 267 (1984). The court therefore remanded the case to the District Court for further proceedings leading to the entry of final judgment, and Mitchell filed a timely petition for certiorari seeking review of the court's rulings on both absolute and qualified immunity.

The question whether the Attorney General is absolutely immune from suit for acts performed in the exercise of his national security functions is an important one that we have hitherto left unanswered. See *Halperin* v. *Kissinger*, 196 U. S. App. D. C., 285, 606 F. 2d 1192 (1979), aff'd by an equally divided Court, 452 U. S. 713 (1981). Moreover, the issue of the appealability before final judgment of orders denying immunity under the objective standard of *Harlow* v. *Fitzgerald* is one that has divided the Courts of Appeals.[5] Finally, the District Court's decision—left standing by the Court of Appeals—that Mitchell's actions violated clearly established law is contrary to the rulings of the District of Columbia Circuit in *Sinclair* v. *Kleindienst*, 207 U. S. App. D. C. 155, 645 F. 2d 1080 (1981), and *Zweibon* v. *Mitchell*, 231 U. S. App. D. C. 398, 720 F. 2d 162 (1983), cert. denied,

established that the warrantless wiretapping in which Mitchell had engaged was illegal.

[5] The First, Eighth, and District of Columbia Circuits have held such orders appealable, see *Krohn* v. *United States*, 742 F. 2d 24 (CA1 1984); *Evans* v. *Dillahunty*, 711 F. 2d 828 (CA8 1983); *McSurely* v. *McClellan*, 225 U. S. App. D. C. 67, 697 F. 2d 309 (1982), while the Fifth and Seventh Circuits have joined the Third Circuit in holding that the courts of appeals lack jurisdiction over interlocutory appeals of qualified immunity rulings, see *Kenyatta* v. *Moore*, 744 F. 2d 1179 (CA5 1984); *Lightner* v. *Jones*, 752 F. 2d 1251 (CA7 1985). The Fourth Circuit has held that a district court's denial of qualified immunity is not appealable when the plaintiff's action involves claims for injunctive relief that will have to be adjudicated regardless of the resolution of any damages claims. *England* v. *Rockefeller*, 739 F. 2d 140 (1984); *Bever* v. *Gilbertson*, 724 F. 2d 1083, cert. denied, 469 U. S. 948 (1984). Because this case does not involve a claim for injunctive relief, the propriety of the Fourth Circuit's approach is not before us, and we express no opinion on the question.

469 U. S. 880 (1984). We granted certiorari to address these issues, 469 U. S. 929 (1984).

II

We first address Mitchell's claim that the Attorney General's actions in furtherance of the national security should be shielded from scrutiny in civil damages actions by an absolute immunity similar to that afforded the President, see *Nixon* v. *Fitzgerald*, 457 U. S. 731 (1982), judges, prosecutors, witnesses, and officials performing "quasi-judicial" functions, see *Briscoe* v. *LaHue*, 460 U. S. 325 (1983); *Butz* v. *Economou*, 438 U. S. 478, 508–517 (1978); *Stump* v. *Sparkman*, 435 U. S. 349 (1978); *Imbler* v. *Pachtman*, 424 U. S. 409 (1976), and legislators, see *Dombrowski* v. *Eastland*, 387 U. S. 82 (1967); *Tenney* v. *Brandhove*, 341 U. S. 367 (1951). We conclude that the Attorney General is not absolutely immune from suit for damages arising out of his allegedly unconstitutional conduct in performing his national security functions.

As the Nation's chief law enforcement officer, the Attorney General provides vital assistance to the President in the performance of the latter's constitutional duty to "preserve, protect, and defend the Constitution of the United States." U. S. Const., Art. II, § 1, cl. 8. Mitchell's argument, in essence, is that the national security functions of the Attorney General are so sensitive, so vital to the protection of our Nation's well-being, that we cannot tolerate any risk that in performing those functions he will be chilled by the possibility of personal liability for acts that may be found to impinge on the constitutional rights of citizens. Such arguments, "when urged on behalf of the President and the national security in its domestic implications, merit the most careful consideration." *Keith*, 407 U. S., at 319. Nonetheless, we do not believe that the considerations that have led us to recognize absolute immunities for other officials dictate the same result in this case.

Our decisions in this area leave no doubt that the Attorney General's status as a Cabinet officer is not in itself sufficient to invest him with absolute immunity: the considerations of separation of powers that call for absolute immunity for state and federal legislators and for the President of the United States do not demand a similar immunity for Cabinet officers or other high executive officials.   See *Harlow* v. *Fitzgerald,* 457 U. S. 800 (1982); *Butz* v. *Economou, supra.*   Mitchell's claim, then, must rest not on the Attorney General's position within the Executive Branch, but on the nature of the functions he was performing in this case.   See *Harlow* v. *Fitzgerald, supra,* at 810–811.   Because Mitchell was not acting in a prosecutorial capacity in this case, the situations in which we have applied a functional approach to absolute immunity questions provide scant support for blanket immunization of his performance of the "national security function."

First, in deciding whether officials performing a particular function are entitled to absolute immunity, we have generally looked for a historical or common-law basis for the immunity in question.   The legislative immunity recognized in *Tenney* v. *Brandhove, supra,* for example, was rooted in the long struggle in both England and America for legislative independence, a presupposition of our scheme of representative government.   The immunities for judges, prosecutors, and witnesses established by our cases have firm roots in the common law.   See *Briscoe* v. *LaHue, supra,* at 330–336. Mitchell points to no analogous historical or common-law basis for an absolute immunity for officers carrying out tasks essential to national security.

Second, the performance of national security functions does not subject an official to the same obvious risks of entanglement in vexatious litigation as does the carrying out of the judicial or "quasi-judicial" tasks that have been the primary wellsprings of absolute immunities.   The judicial process is an arena of open conflict, and in virtually every case there is, if not always a winner, at least one loser.   It is inevitable

that many of those who lose will pin the blame on judges, prosecutors, or witnesses and will bring suit against them in an effort to relitigate the underlying conflict. See *Bradley* v. *Fisher*, 13 Wall. 335, 348 (1872). National security tasks, by contrast, are carried out in secret; open conflict and overt winners and losers are rare. Under such circumstances, it is far more likely that actual abuses will go uncovered than that fancied abuses will give rise to unfounded and burdensome litigation.[6] Whereas the mere threat of litigation may significantly affect the fearless and independent performance of duty by actors in the judicial process, it is unlikely to have a similar effect on the Attorney General's performance of his national security tasks.

Third, most of the officials who are entitled to absolute immunity from liability for damages are subject to other checks that help to prevent abuses of authority from going unredressed. Legislators are accountable to their constituents, see *Tenney* v. *Brandhove, supra,* at 378, and the judicial process is largely self-correcting: procedural rules, appeals, and the possibility of collateral challenges obviate the need

---

[6] We recognize that Mitchell himself has faced a significant number of lawsuits stemming from his authorization of warrantless national security wiretaps. See *Zweibon* v. *Mitchell,* 231 U. S. App. D. C. 398, 720 F. 2d 162 (1983), cert. denied, 469 U. S. 880 (1984); *Sinclair* v. *Kleindienst,* 207 U. S. App. D. C. 155, 645 F. 2d 1080 (1981); *Smith* v. *Nixon,* 196 U. S. App. D. C. 276, 606 F. 2d 1183 (1979); *Halperin* v. *Kissinger,* 196 U. S. App. D. C. 285, 606 F. 2d 1192 (1979), aff'd by an equally divided Court, 452 U. S. 713 (1981); *Weinberg* v. *Mitchell,* 588 F. 2d 275 (CA9 1978); *Burkhart* v. *Saxbe,* 596 F. Supp. 96 (ED Pa. 1984); *McAlister* v. *Kleindienst,* Civ. Action No. 72–1977 (filed Oct. 10, 1972, ED Pa.). This spate of litigation does not, however, seriously undermine our belief that the Attorney General's national security duties will not tend to subject him to large numbers of frivolous lawsuits. All of these cases involved warrantless wiretapping authorized by the Attorney General and were generated by our decision in *Keith.* They do not suggest that absolute immunity rather than qualified immunity is necessary for the proper performance of the Attorney General's role in protecting national security.

for damages actions to prevent unjust results. Similar built-in restraints on the Attorney General's activities in the name of national security, however, do not exist. And despite our recognition of the importance of those activities to the safety of our Nation and its democratic system of government, we cannot accept the notion that restraints are completely unnecessary. As the Court observed in *Keith*, the label of "national security" may cover a multitude of sins:

> "National security cases . . . often reflect a convergence of First and Fourth Amendment values not present in cases of 'ordinary' crime. Though the investigative duty of the executive may be stronger in such cases, so also is there greater jeopardy to constitutionally protected speech. . . . History abundantly documents the tendency of Government—however, benevolent and benign its motives—to view with suspicion those who most fervently dispute its policies. . . . The danger to political dissent is acute where the Government attempts to act under so vague a concept as the power to protect 'domestic security.' Given the difficulty of defining the domestic security interest, the danger of abuse in acting to protect that interest becomes apparent." 407 U. S., at 313–314.

The danger that high federal officials will disregard constitutional rights in their zeal to protect the national security is sufficiently real to counsel against affording such officials an absolute immunity.[7]

---

[7] It is true that damages actions are not the only conceivable deterrents to constitutional violations by the Attorney General. Mitchell suggests, for example, the possibility of declaratory or injunctive relief and the use of the exclusionary rule to prevent the admission of illegally seized evidence in criminal proceedings. However, as Justice Harlan pointed out in his concurring opinion in *Bivens* v. *Six Unknown Fed. Narcotics Agents*, 403 U. S. 388, 398–411 (1971), such remedies are useless where a citizen not accused of any crime has been subjected to a completed constitutional vi-

We emphasize that the denial of absolute immunity will not leave the Attorney General at the mercy of litigants with frivolous and vexatious complaints. Under the standard of qualified immunity articulated in *Harlow* v. *Fitzgerald,* the Attorney General will be entitled to immunity so long as his actions do not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." 457 U. S., at 818. This standard will not allow the Attorney General to carry out his national security functions wholly free from concern for his personal liability; he may on occasion have to pause to consider whether a proposed course of action can be squared with the Constitution and laws of the United States. But this is precisely the point of the *Harlow* standard: "Where an official could be expected to know that his conduct would violate statutory or constitutional rights, he *should* be made to hesitate . . . ." *Id.,* at 819 (emphasis added). This is as true in matters of national security as in other fields of governmental action. We do not believe that the security of the Republic will be threatened if its Attorney General is given incentives to abide by clearly established law.

## III

Although 28 U. S. C. § 1291 vests the courts of appeals with jurisdiction over appeals only from "final decisions" of the district courts, "a decision 'final' within the meaning of § 1291 does not necessarily mean the last order possible to be made in a case." *Gillespie* v. *United States Steel Corp.,* 379 U. S. 148, 152 (1964). Thus, a decision of a district court is appealable if it falls within "that small class which finally determine claims of right separable from, and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that

---

olation: in such cases, "it is damages or nothing." *Id.,* at 410. Other possibilities mentioned by Mitchell—including criminal prosecution and impeachment of the Attorney General—would be of dubious value for deterring all but the most flagrant constitutional violations.

appellate consideration be deferred until the whole case is adjudicated." *Cohen* v. *Beneficial Industrial Loan Corp.*, 337 U. S., at 546.

A major characteristic of the denial or granting of a claim appealable under *Cohen*'s "collateral order" doctrine is that "unless it can be reviewed before [the proceedings terminate], it never can be reviewed at all." *Stack* v. *Boyle*, 342 U. S. 1, 12 (1952) (opinion of Jackson, J.); see also *United States* v. *Hollywood Motor Car Co.*, 458 U. S. 263, 266 (1982). When a district court has denied a defendant's claim of right not to stand trial, on double jeopardy grounds, for example, we have consistently held the court's decision appealable, for such a right cannot be effectively vindicated after the trial has occurred. *Abney* v. *United States*, 431 U. S. 651 (1977).[8] Thus, the denial of a substantial claim of absolute immunity is an order appealable before final judgment, for the essence of absolute immunity is its possessor's entitlement not to have to answer for his conduct in a civil damages action. See *Nixon* v. *Fitzgerald*, 457 U. S. 731 (1982); cf. *Helstoski* v. *Meanor*, 442 U. S. 500 (1979).

At the heart of the issue before us is the question whether qualified immunity shares this essential attribute of absolute immunity—whether qualified immunity is in fact an entitlement not to stand trial under certain circumstances. The conception animating the qualified immunity doctrine as set forth in *Harlow* v. *Fitzgerald*, 457 U. S. 800 (1982), is that "where an official's duties legitimately require action in which clearly established rights are not implicated, the public interest may be better served by action taken 'with independence and without fear of consequences.'" *Id.*, at 819, quoting *Pierson* v. *Ray*, 386 U. S. 547, 554 (1967). As the citation to

---

[8] Similarly, we have held that state-court decisions rejecting a party's federal-law claim that he is not subject to suit before a particular tribunal are "final" for purposes of our certiorari jurisdiction under 28 U. S. C. § 1257. *Mercantile National Bank* v. *Langdeau*, 371 U. S. 555 (1963); *Construction Laborers* v. *Curry*, 371 U. S. 542 (1963).

*Pierson* v. *Ray* makes clear, the "consequences" with which we were concerned in *Harlow* are not limited to liability for money damages; they also include "the general costs of subjecting officials to the risks of trial—distraction of officials from their governmental duties, inhibition of discretionary action, and deterrence of able people from public service." *Harlow*, 457 U. S., at 816. Indeed, *Harlow* emphasizes that even such pretrial matters as discovery are to be avoided if possible, as "[i]nquiries of this kind can be peculiarly disruptive of effective government." *Id.*, at 817.

With these concerns in mind, the *Harlow* Court refashioned the qualified immunity doctrine in such a way as to "permit the resolution of many insubstantial claims on summary judgment" and to avoid "subject[ing] government officials either to the costs of trial or to the burdens of broad-reaching discovery" in cases where the legal norms the officials are alleged to have violated were not clearly established at the time. *Id.*, at 817–818. Unless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery. See *id.*, at 818. Even if the plaintiff's complaint adequately alleges the commission of acts that violated clearly established law, the defendant is entitled to summary judgment if discovery fails to uncover evidence sufficient to create a genuine issue as to whether the defendant in fact committed those acts. *Harlow* thus recognized an entitlement not to stand trial or face the other burdens of litigation, conditioned on the resolution of the essentially legal question whether the conduct of which the plaintiff complains violated clearly established law. The entitlement is an *immunity from suit* rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial. Accordingly, the reasoning that underlies the immediate appealability of an order denying absolute immunity indicates

to us that the denial of qualified immunity should be similarly appealable: in each case, the district court's decision is effectively unreviewable on appeal from a final judgment.

An appealable interlocutory decision must satisfy two additional criteria: it must "conclusively determine the disputed question," *Coopers & Lybrand* v. *Livesay*, 437 U. S. 463, 468 (1978), and that question must involve a "clai[m] of right separable from, and collateral to, rights asserted in the action," *Cohen, supra,* at 546. The denial of a defendant's motion for dismissal or summary judgment on the ground of qualified immunity easily meets these requirements. Such a decision is "conclusive" in either of two respects. In some cases, it may represent the trial court's conclusion that even if the facts are as asserted by the defendant, the defendant's actions violated clearly established law and are therefore not within the scope of the qualified immunity. In such a case, there will be nothing in the subsequent course of the proceedings in the district court that can alter the court's conclusion that the defendant is not immune. Alternatively, the trial judge may rule only that if the facts are as asserted by the plaintiff, the defendant is not immune. At trial, the plaintiff may not succeed in proving his version of the facts, and the defendant may thus escape liability. Even so, the court's denial of summary judgment finally and conclusively determines the defendant's claim of right not to *stand trial* on the plaintiff's allegations, and because "[t]here are simply no further steps that can be taken in the District Court to avoid the trial the defendant maintains is barred," it is apparent that "*Cohen*'s threshold requirement of a fully consummated decision is satisfied" in such a case. *Abney* v. *United States*, 431 U. S., at 659.

Similarly, it follows from the recognition that qualified immunity is in part an entitlement not to be forced to litigate the consequences of official conduct that a claim of immunity is conceptually distinct from the merits of the plaintiff's claim

that his rights have been violated. See *id.*, at 659–660. An appellate court reviewing the denial of the defendant's claim of immunity need not consider the correctness of the plaintiff's version of the facts, nor even determine whether the plaintiff's allegations actually state a claim. All it need determine is a question of law: whether the legal norms allegedly violated by the defendant were clearly established at the time of the challenged actions or, in cases where the district court has denied summary judgment for the defendant on the ground that even under the defendant's version of the facts the defendant's conduct violated clearly established law, whether the law clearly proscribed the actions the defendant claims he took.[9] To be sure, the resolution of these legal issues will entail consideration of the factual allegations that make up the plaintiff's claim for relief; the same is true, however, when a court must consider whether a prosecution is barred by a claim of former jeopardy or whether a Congressman is absolutely immune from suit because the complained of conduct falls within the protections of the Speech and Debate Clause. In the case of a double jeopardy claim, the court must compare the facts alleged in the second indictment with those in the first to determine whether the prosecutions are for the same offense, while in evaluating a claim of immunity under the Speech and Debate Clause, a court must analyze the plaintiff's complaint to determine whether the plaintiff seeks to hold a Congressman liable for protected legislative actions or for other, unprotected conduct. In holding these and similar issues of absolute immunity to be appealable under the collateral order doctrine, see *Abney* v. *United States, supra; Helstoski* v. *Meanor,* 442 U. S. 500 (1979); *Nixon* v. *Fitzgerald,* 457 U. S. 731 (1982), the Court has recognized that a question of immunity is separate from the merits of the underlying action for purposes of

---

[9] We emphasize at this point that the appealable issue is a purely legal one: whether the facts alleged (by the plaintiff, or, in some cases, the defendant) support a claim of violation of clearly established law.

the *Cohen* test even though a reviewing court must consider the plaintiff's factual allegations in resolving the immunity issue.[10]

---

[10] In advancing its view of the "separate from the merits" aspect of the *Cohen* test, JUSTICE BRENNAN's dissent fails to account for our rulings on appealability of denials of claims of double jeopardy and absolute immunity. If, as the dissent seems to suggest, any factual overlap between a collateral issue and the merits of the plaintiff's claim is fatal to a claim of immediate appealability, none of these matters could be appealed, for all of them require an inquiry into whether the plaintiff's (or, in the double jeopardy situation, the Government's) factual allegations state a claim that falls outside the scope of the defendant's immunity. There is no distinction in principle between the inquiry in such cases and the inquiry where the issue is qualified immunity. Moreover, the dissent's characterization of the double jeopardy and absolute immunity cases as involving issues that are not "necessarily . . . conclusive or even relevant to the question whether the defendant is ultimately liable on the merits," *post,* at 547, is of course inaccurate: meritorious double jeopardy and absolute immunity claims are necessarily directly controlling of the question whether the defendant will ultimately be liable. Indeed, if our holdings on the appealability of double jeopardy and absolute immunity rulings make anything clear it is that the fact that an issue is outcome determinative does not mean that it is not "collateral" for purposes of the *Cohen* test. The dissent's explanation that the absolute immunity and double jeopardy cases do not involve a determination of the defendant's liability *"on the merits"* similarly fails to distinguish those cases from this one. The reason is that the legal determination that a given proposition of law was not clearly established at the time the defendant committed the alleged acts does not entail a determination of the "merits" of the plaintiff's claim that the defendant's actions were in fact unlawful.

Nor do we see any inconsistency between our ruling here and the handling of the "completely separate from the merits" requirement in *Richardson-Merrell Inc.* v. *Koller, ante,* p. 424. Contrary to JUSTICE BRENNAN's suggestion, the *Richardson-Merrell* Court's alternative holding that the issue of disqualification of counsel in a civil case is not separate from the merits is not based only on the fact that the issue involves some factual overlap with the merits of the underlying litigation. Rather, the Court in *Richardson-Merrell* observes that the question whether a district court's disqualification order should be reversed may depend on the effect of disqualification (or nondisqualification) on the success of the parties in litigating the other legal and factual issues that form their underlying

Accordingly, we hold that a district court's denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is an appealable "final decision" within the meaning of 28 U. S. C. § 1291 notwithstanding the absence of a final judgment.

## IV

The Court of Appeals thus had jurisdiction over Mitchell's claim of qualified immunity, and that question was one of the questions presented in the petition for certiorari which we granted without limitation. Moreover, the purely legal question on which Mitchell's claim of immunity turns is "appropriate for our immediate resolution" notwithstanding that it was not addressed by the Court of Appeals. *Nixon* v. *Fitzgerald, supra,* at 743, n. 23. We therefore turn our attention to the merits of Mitchell's claim of immunity.

Under *Harlow* v. *Fitzgerald,* Mitchell is immune unless his actions violated clearly established law. See 457 U. S., at 818–819; see also *Davis* v. *Scherer,* 468 U. S. 183, 197 (1984). Forsyth complains that in November 1970, Mitchell authorized a warrantless wiretap aimed at gathering intelligence regarding a domestic threat to national security—the kind of wiretap that the Court subsequently declared to be illegal. *Keith,* 407 U. S. 297 (1972). The question of Mitchell's immunity turns on whether it was clearly established in November 1970, well over a year before *Keith* was decided, that such wiretaps were unconstitutional. We conclude that it was not.

The use of warrantless electronic surveillance to gather intelligence in cases involving threats to the Nation's security can be traced back to 1940, when President Roosevelt instructed Attorney General Robert Jackson that he was authorized to approve wiretaps of persons suspected of sub-

---

dispute. Accordingly, the propriety of a disqualification order—unlike a qualified immunity ruling—is not a legal issue that can be decided with reference only to undisputed facts and in isolation from the remaining issues of the case.

versive activities. In 1946, President Truman's approval of Attorney General Tom Clark's request for expanded wiretapping authority made it clear that the Executive Branch perceived its authority to extend to cases involving "domestic security." See Report of the National Commission for the Review of Federal and State Laws Relating to Wiretapping and Electronic Surveillance 36 (1976). Attorneys General serving Presidents Eisenhower, Kennedy, Johnson, and Nixon continued the practice of employing warrantless electronic surveillance in their efforts to combat perceived threats to the national security, both foreign and domestic. See *Keith, supra,* at 310–311, n. 10.

Until 1967, it was anything but clear that these practices violated the Constitution: the Court had ruled in *Olmstead* v. *United States,* 277 U. S. 438 (1928), that a wiretap not involving a physical trespass on the property of the person under surveillance was not a search for purposes of the Fourth Amendment, and although the rule in *Olmstead* had suffered some erosion, see *Silverman* v. *United States,* 365 U. S. 505 (1961), the Court had never explicitly disavowed it. Not until 1967 did the Court hold that electronic surveillance unaccompanied by any physical trespass constituted a search subject to the Fourth Amendment's restrictions, including the Warrant Clause. *Katz* v. *United States,* 389 U. S. 347. Yet the *Katz* Court recognized that warrantless searches do not in all circumstances violate the Fourth Amendment; and though the Court held that no recognized exception to the warrant requirement could justify warrantless wiretapping in an ordinary criminal case, the Court was careful to note that "[w]hether safeguards other than prior authorization by a magistrate would satisfy the Fourth Amendment in a situation involving the national security is a question not presented by this case." *Id.,* at 358, n. 23. In separate concurrences, Members of the Court debated the question whether the President or the Attorney General could constitutionally authorize warrantless wiretapping in the interest of national security. Compare *id.,* at 359–360 (Douglas, J., joined by

BRENNAN, J., concurring), with *id.*, at 362–364 (WHITE, J., concurring).

In the aftermath of *Katz*, Executive authority to order warrantless national security wiretaps remained uncertain. This uncertainty found expression in Title III of the Omnibus Crime Control and Safe Streets Act of 1968, in which Congress attempted to fashion rules governing wiretapping and electronic surveillance that would "meet the constitutional requirements for electronic surveillance enunciated by this Court in *Berger* v. *New York*, 388 U. S. 41 (1967), and *Katz* v. *United States*, 389 U. S. 347 (1967)." *Keith*, *supra*, at 302. Although setting detailed standards governing wiretapping by both state and federal law enforcement agencies, the Act disclaimed any intention "to limit the constitutional power of the President to take such measures as he deems necessary to protect the United States against the overthrow of the Government by force or other unlawful means, or against any other clear and present danger to the structure or existence of the Government." 18 U. S. C. § 2511(3) (1976 ed.). As subsequently interpreted by this Court in *Keith*, this provision of the Act was an "expression of neutrality," 407 U. S., at 308, reflecting both an awareness on the part of Congress of the uncertain scope of Executive authority to conduct warrantless national security wiretaps and an unwillingness to circumscribe whatever such authority might exist.[11]

---

[11] The District Court's suggestion that Mitchell's actions violated clearly established law because they were in conflict with Title III, see n. 2, *supra*, is therefore expressly contradicted by *Keith*, in which the Court held that Title III "simply did not legislate with respect to national security surveillances." 407 U. S., at 306. Given Congress' express disclaimer of any intention to limit the President's national security wiretapping powers, it cannot be said that Mitchell's actions were unlawful under Title III, let alone that they were clearly unlawful. *Keith* similarly requires rejection of Forsyth's submission that the legality of the wiretap under Title III is open on remand because it has never been shown that the tap was justified by a "clear and present danger" to the national security. See 18 U. S. C. § 2511(3) (1976 ed.). The *Keith* majority's handling of the statutory

Uncertainty regarding the legitimacy of warrantless national security wiretapping during the period between *Katz* and *Keith* is also reflected in the decisions of the lower federal courts. In a widely cited decision handed down in July 1969, the United States District Court for the Southern District of Texas held that the President, acting through the Attorney General, could legally authorize warrantless wiretaps to gather foreign intelligence in the interest of national security. *United States* v. *Clay*, CR. No. 67–H–94 (SD Tex., July 14, 1969), aff'd, 430 F. 2d 165, 171 (CA5 1970), rev'd on other grounds, 403 U. S. 698 (1971). *Clay*, of course, did not speak to the legality of surveillance directed against domestic threats to the national security, but it was soon applied by two Federal District Courts to uphold the constitutionality of warrantless wiretapping directed against the Black Panthers, a domestic group believed by the Attorney General to constitute a threat to the national security. *United States* v. *Dellinger*, No. 69 CR 180 (ND Ill., Feb. 20, 1970) (App. 30), rev'd, 472 F. 2d 340 (CA7 1972); *United States* v. *O'Neal*, No. KC–CR–1204 (Kan., Sept. 1, 1970) (App. 38), appeal dism'd, 453 F. 2d 344 (CA10 1972).

So matters stood when Mitchell authorized the Davidon wiretap at issue in this case. Only days after the termination of the Davidon wiretap, however, two District Courts explicitly rejected the Justice Department's contention that the Attorney General had the authority to order warrantless wiretaps in domestic national security cases. *United States* v. *Smith*, 321 F. Supp. 424 (CD Cal., Jan. 8, 1971); *United States* v. *Sinclair*, 321 F. Supp. 1074 (ED Mich., Jan. 26, 1971). The Sixth Circuit affirmed the *Sinclair* decision in *United States* v. *United States District Court for Eastern Dist. of Mich.*, 444 F. 2d 651 (1971), and our own affirmance followed in 1972. *Keith, supra.*

---

question makes clear that the statutory exemption for national security wiretaps did not depend on a showing of an actual clear and present danger.

534

In short, the doctrine of Executive authority to conduct warrantless domestic security wiretaps did not long survive the expiration of the Davidon wiretap. It by no means follows, however, that Mitchell's actions in authorizing the wiretap violated law that was clearly established at the time of the authorization. As of 1970, the Justice Departments of six successive administrations had considered warrantless domestic security wiretaps constitutional. Only three years earlier, this Court had expressly left open the possibility that this view was correct. Two Federal District Courts had accepted the Justice Department's position, and although the Sixth Circuit later firmly rejected the notion that the Fourth Amendment countenanced warrantless domestic security wiretapping, this Court found the issue sufficiently doubtful to warrant the exercise of its discretionary jurisdiction. In framing the issue before it, the *Keith* Court explicitly recognized that the question was one that had yet to receive the definitive answer that it demanded:

> "The issue before us is an important one for the people of our country and their Government. It involves the delicate question of the President's power, acting through the Attorney General, to authorize electronic surveillance in internal security matters without prior judicial approval. Successive Presidents for more than one-quarter of a century have authorized such surveillance in varying degrees, without guidance from the Congress or a definitive decision of this Court. This case brings the issue here for the first time. Its resolution is a matter of national concern, requiring sensitivity both to the Government's right to protect itself from unlawful subversion and attack and to the citizen's right to be secure in his privacy against unreasonable Government intrusion." 407 U. S., at 299.

Of course, *Keith* finally laid to rest the notion that warrantless wiretapping is permissible in cases involving domestic threats to the national security. But whatever the agree-

ment with the Court's decision and reasoning in *Keith* may be, to say that the principle *Keith* affirmed had already been "clearly established" is to give that phrase a meaning that it cannot easily bear.[12] The legality of the warrantless domestic security wiretap Mitchell authorized in November 1970, was, at that time, an open question, and *Harlow* teaches that officials performing discretionary functions are not subject to suit when such questions are resolved against them only after they have acted. The District Court's conclusion that Mitchell is not immune because he gambled and lost on the resolution of this open question departs from the principles of *Harlow*. Such hindsight-based reasoning on immunity issues is precisely what *Harlow* rejected. The decisive fact is not that Mitchell's position turned out to be incorrect, but that the question was open at the time he acted. Hence, in the absence of contrary directions from Congress, Mitchell is immune from suit for his authorization of the Davidon wiretap notwithstanding that his actions violated the Fourth Amendment.[13]

---

[12] We do not intend to suggest that an official is always immune from liability or suit for a warrantless search merely because the warrant requirement has never explicitly been held to apply to a search conducted in identical circumstances. But in cases where there is a legitimate question whether an exception to the warrant requirement exists, it cannot be said that a warrantless search violates clearly established law.

[13] Forsyth insists that even if the District Court was incorrect in concluding that warrantless national security wiretaps conducted in 1970–1971 violated clearly established law, Mitchell is not entitled to summary judgment because it has never been found that his actions were in fact motivated by a concern for national security. This submission is untenable. The District Court held a hearing on the purpose of the wiretap and took Mitchell at his word that the wiretap was a national security interception, not a prosecutorial function for which absolute immunity was recognized. The court then concluded that the tap violated the Fourth Amendment and that Mitchell was not immune from liability for this violation under the *Harlow* standard. Had the court not concluded that the wiretap was indeed a national security wiretap, the qualified immunity question would never have been reached, for the tap would clearly have been illegal under Title III, and qualified immunity hence unavailable. In this light, the District

## V

We affirm the Court of Appeals' denial of Mitchell's claim to absolute immunity. The court erred, however, in declining to accept jurisdiction over the question of qualified immunity; and to the extent that the effect of the judgment of the Court of Appeals is to leave standing the District Court's erroneous decision that Mitchell is not entitled to summary judgment on the ground of qualified immunity, the judgment of the Court of Appeals is reversed.

*It is so ordered.*

JUSTICE POWELL took no part in the decision of this case.

JUSTICE REHNQUIST took no part in the consideration or decision of this case.

CHIEF JUSTICE BURGER, concurring in part.

With JUSTICE O'CONNOR, I join Parts I, III, and IV of the Court's opinion and the judgment of the Court. I also agree that the Court's discussion of the absolute immunity issue is unnecessary for the resolution of this case. I write separately to emphasize my agreement with JUSTICE STEVENS that the Court's extended discussion of this issue reaches the wrong conclusion.

In *Gravel* v. *United States*, 408 U. S. 606 (1972), we held that aides of Members of Congress who implement the legislative policies and decisions of the Member enjoy the same absolute immunity from suit under the Speech and Debate Clause that the Members themselves enjoy. As I noted in dissent in *Harlow* v. *Fitzgerald*, 457 U. S. 800, 822 (1982), the logic underlying *Gravel* applies equally to top Executive aides. A Cabinet officer—and surely none more than the Attorney General—is an "aide" and arm of the President in

Court's handling of the case precludes any suggestion that the wiretap was either (1) authorized for criminal investigatory purposes, or (2) authorized for some purpose unrelated to national security.

the execution of the President's constitutional duty to "take Care that the Laws be faithfully executed." It is an astonishing paradox that the aides of the 100 Senators and 435 Representatives share the absolute immunity of the Member, but the President's chief aide in protecting internal national security does not. I agree that the petitioner was entitled to absolute immunity for actions undertaken in his exercise of the discretionary power of the President in the area of national security.

JUSTICE O'CONNOR, with whom THE CHIEF JUSTICE joins, concurring in part.

I join Parts I, III, and IV of the majority opinion and the judgment of the Court. Our previous cases concerning the qualified immunity doctrine indicate that a defendant official whose conduct did not violate clearly established legal norms is entitled to avoid trial. *Davis* v. *Scherer*, 468 U. S. 183 (1984); *Harlow* v. *Fitzgerald*, 457 U. S. 800, 815–819 (1982). This entitlement is analogous to the right to avoid trial protected by absolute immunity or by the Double Jeopardy Clause. Where the district court rejects claims that official immunity or double jeopardy preclude trial, the special nature of the asserted right justifies immediate review. The very purpose of such immunities is to protect the defendant from the burdens of trial, and the right will be irretrievably lost if its denial is not immediately appealable. See *Helstoski* v. *Meanor*, 442 U. S. 500, 506–508 (1979); *Abney* v. *United States*, 431 U. S. 651, 660–662 (1977). I agree that the District Court's denial of qualified immunity comes within the small class of interlocutory orders appealable under *Cohen* v. *Beneficial Industrial Loan Corp.*, 337 U. S. 541 (1949).

Because I also agree that the District Court erred in holding that petitioner's authorization of the wiretaps in 1970 violated legal rights that were clearly established at the time, I concur in the judgment of the Court. The conclusion that

petitioner is entitled to qualified immunity is sufficient to resolve this case, and therefore I would not reach the issue whether the Attorney General may claim absolute immunity when he acts to prevent a threat to national security. Accordingly, I decline to join Parts II and V of the Court's opinion.

JUSTICE STEVENS, concurring in the judgment.

Some public officials are "shielded by absolute immunity from civil damages liability." *Nixon* v. *Fitzgerald*, 457 U. S. 731, 748 (1982). For Members of Congress that shield is expressly provided by the Constitution.[1] For various state officials the shield is actually a conclusion that the Congress that enacted the 1871 Civil Rights Act did not intend to subject them to damages liability.[2] Federal officials have also been accorded immunity by cases holding that Congress did not intend to subject them to individual liability even for constitutional violations. *Bush* v. *Lucas*, 462 U. S. 367 (1983). The absolute immunity of the President of the United States rests, in part, on the absence of any indication that the authors of either the constitutional text or any relevant statutory text intended to subject him to damages liability predicated on his official acts.

The practical consequences of a holding that no remedy has been authorized against a public official are essentially the same as those flowing from a conclusion that the official has absolute immunity. Moreover, similar factors are evaluated in deciding whether to recognize an implied cause of action or a claim of immunity. In both situations, when Congress is

---

[1] "The Senators and Representatives . . . shall in all Cases, except Treason, Felony and Breach of the Peace, be privileged from Arrest during their Attendance at the Session of their respective Houses and in going to and returning from the same; and for any Speech or Debate in either House, they shall not be questioned in any other Place." U. S. Const., Art. I, § 6, cl. 1.

[2] See, *e. g.*, *Tenney* v. *Brandhove*, 341 U. S. 367 (1951); *Pierson* v. *Ray*, 386 U. S. 547 (1967); *Imbler* v. *Pachtman*, 424 U. S. 409 (1976).

silent, the Court makes an effort to ascertain its probable intent.  In my opinion, when Congress has legislated in a disputed area, that legislation is just as relevant to any assertion of official immunity as to the analysis of the question whether an implied cause of action should be recognized.

In Title III of the Omnibus Crime Control and Safe Streets Act of 1968,[3] Congress enacted comprehensive legislation regulating the electronic interception of wire and oral communications.  See 18 U. S. C. §§ 2510–2520.  One section of that Act, § 2511(3) (1976 ed.), specifically exempted "any wire or oral communication intercepted by authority of the President" for national security purposes.[4]  In *United States* v. *United States District Court*, 407 U. S. 297 (1972) *(Keith)*, the Court held that certain wiretaps authorized by the Attorney General were covered by the proviso in § 2511(3) and therefore exempt from the prohibitions in Title III.  *Id.*, at 301–308.[5]  The wiretap in this case was authorized on

---

[3] 82 Stat. 212.

[4] At the time the Attorney General authorized the wiretap involved in this case 18 U. S. C. § 2511(3) (1976 ed.) provided:

"Nothing contained in this chapter or in section 605 of the Communications Act of 1934 . . . shall limit the constitutional power of the President to take such measures as he deems necessary to protect the Nation against actual or potential attack or other hostile acts of a foreign power, to obtain foreign intelligence information deemed essential to the security of the United States, or to protect national security information against foreign intelligence activities.  *Nor shall anything contained in this chapter be deemed to limit the constitutional power of the President to take such measures as he deems necessary to protect the United States against the overthrow of the Government by force or other unlawful means, or against any other clear and present danger to the structure or existence of the Government.*  The contents of any wire or oral communication intercepted by authority of the President in the exercise of the foregoing powers may be received in evidence in any trial hearing, or other proceeding only where such interception was reasonable, and shall not be otherwise used or disclosed except as is necessary to implement that power" (emphasis added).

As the Court points out, *ante*, at 514, n. 1, this section has been repealed.

[5] Attorney General Mitchell's affidavit justifying the warrantless electronic surveillance in *Keith* is quoted in the Court's opinion.  407 U. S.,

November 6, 1970, by then Attorney General Mitchell. The affidavit later submitted to the District Court justifying the wiretap on national security grounds is a virtual carbon copy of the justification the Attorney General offered for the electronic surveillance involved in *Keith*. App. 23. For that reason, on the authority of *Keith*, the Court holds that this case involves a national security wiretap undertaken under the "authority of the President" which is exempted from Title III by § 2511(3). See *ante*, at 532–533, n. 11, and 535–536, n. 13.

The Court's determination in this case and in *Keith* that Attorney General Mitchell was exercising the discretionary "power of the President" in the area of national security when he authorized these episodes of surveillance inescapably leads to the conclusion that absolute immunity attached to the special function then being performed by Mitchell. In *Harlow* v. *Fitzgerald*, 457 U. S. 800 (1982), the Court explicitly noted that absolute immunity may be justified for Presidential "aides entrusted with discretionary authority in such sensitive areas as national security or foreign policy . . . to protect the unhesitating performance of functions vital to the national interest." *Id.*, at 812. In "such 'central' Presidential domains as foreign policy and national security" the President cannot "discharge his singularly vital mandate without delegating functions nearly as sensitive as his own." *Id.*, at 812, n. 19.

Here, the President expressly had delegated the responsibility to approve national security wiretaps to the Attorney General.[6] The Attorney General determined that the wire-

---

at 300–301, n. 2. In his separate opinion disagreeing with the Court's construction of § 2511(3), JUSTICE WHITE pointed out that the language of that section by no means compelled the conclusion that the Court reached. See *id.*, at 336–343. The Court's construction of § 2511(3) is nevertheless controlling in this case.

[6] See Memorandum for Heads of Executive Departments and Agencies (June 30, 1965), reprinted in *United States* v. *United States District Court for Eastern Dist. of Mich., Southern Div.*, 444 F. 2d 651, 670–671 (CA6 1971), aff'd, 407 U. S. 297 (1972).

tap in this case was essential to gather information about a conspiracy that might be plotting to kidnap a Presidential adviser and sabotage essential facilities in Government buildings. That the Attorney General was too vigorous in guaranteeing the personal security of a Presidential aide and the physical integrity of important Government facilities does not justify holding him personally accountable for damages in a civil action that has not been authorized by Congress.

When the Attorney General, the Secretary of State, and the Secretary of Defense make erroneous decisions on matters of national security and foreign policy, the primary liabilities are political. Intense scrutiny, by the people, by the press, and by Congress, has been the traditional method for deterring violations of the Constitution by these high officers of the Executive Branch. Unless Congress authorizes other remedies, it presumably intends the retributions for any violations to be undertaken by political action. Congress is in the best position to decide whether the incremental deterrence added by a civil damages remedy outweighs the adverse effect that the exposure to personal liability may have on governmental decisionmaking. However the balance is struck, there surely is a national interest in enabling Cabinet officers with responsibilities in this area to perform their sensitive duties with decisiveness and without potentially ruinous hesitation.[7]

The passions aroused by matters of national security and foreign policy[8] and the high profile of the Cabinet officers

---

[7] Cf. *Pierson* v. *Ray*, 386 U. S. 547, 554 (1967) ("[A judge's] errors may be corrected on appeal, but he should not have to fear that unsatisfied litigants may hound him with litigation charging malice and corruption. Imposing such a burden on judges would contribute not to principled and fearless decision-making but to intimidation"); *Imbler* v. *Pachtman*, 424 U. S., at 424–425 ("The public trust of the prosecutor's office would suffer if he were constrained in making every decision by the consequences in terms of his own potential liability in a suit for damages").

[8] Cf. *Pierson* v. *Ray*, 386 U. S., at 554 ("It is a judge's duty to decide all cases within his jurisdiction that are brought before him, including controversial cases that arouse the most intense feelings in the litigants").

with functions in that area make them "easily identifiable target[s] for suits for civil damages." *Nixon* v. *Fitzgerald*, 457 U. S., at 753. Persons of wisdom and honor will hesitate to answer the President's call to serve in these vital positions if they fear that vexatious and politically motivated litigation associated with their public decisions will squander their time and reputation, and sap their personal financial resources when they leave office. The multitude of lawsuits filed against high officials in recent years only confirms the rationality of this anxiety.[9] The availability of qualified immunity is hardly comforting when it took 13 years for the federal courts to determine that the plaintiff's claim in this case was without merit.

If the Attorney General had violated the provisions of Title III, as JUSTICE WHITE argued in *Keith*, he would have no immunity. Congress, however, had expressly refused to enact a civil remedy against Cabinet officials exercising the President's powers described in § 2511(3). In that circumstance, I believe the Cabinet official is entitled to the same absolute immunity as the President of the United States. Indeed, it is highly doubtful whether the rationale of *Bivens* v. *Six Unknown Federal Narcotics Agents*, 403 U. S. 388 (1971), even supports an implied cause of action for damages after Congress has enacted legislation comprehensively regulating the field of electronic surveillance but has specifically declined to impose a remedy for the national security wiretaps described in § 2511(3). See *id.*, at 396–397; *Bush* v. *Lucas*, 462 U. S. 367, 378 (1983). Congress' failure to act after careful consideration of the matter is a factor counselling some hesitation.

Accordingly, I concur in the judgment to the extent that it requires an entry of summary judgment in favor of former Attorney General Mitchell.

---

[9] The many lawsuits filed against Attorney General Mitchell for his authorization of pre-*Keith* wiretaps is only one example of such litigation. See *ante*, at 522, n. 6.

JUSTICE BRENNAN, with whom JUSTICE MARSHALL joins, concurring in part and dissenting in part.

I join Parts I and II of the Court's opinion, for I agree that qualified immunity sufficiently protects the legitimate needs of public officials, while retaining a remedy for those whose rights have been violated. Because denial of absolute immunity is immediately appealable, *Nixon* v. *Fitzgerald*, 457 U. S. 731, 743 (1982), the issue is squarely before us and, in my view, rightly decided.

I disagree, however, with the Court's holding that the qualified immunity issue is properly before us. For the purpose of applying the final judgment rule embodied in 28 U. S. C. § 1291, I see no justification for distinguishing between the denial of Mitchell's claim of qualified immunity and numerous other pretrial motions that may be reviewed only on appeal of the final judgment in the case. I therefore dissent from its holding that denials of qualified immunity, at least where they rest on undisputed facts, are generally appealable.

I

The Court acknowledges that the trial court's refusal to grant Mitchell qualified immunity was not technically the final order possible in the trial court. If the refusal is to be immediately appealable, therefore, it must come within the narrow confines of the collateral order doctrine of *Cohen* v. *Beneficial Industrial Loan Corp.*, 337 U. S. 541, 546 (1949), and its progeny. Although the Court has, over the years, varied its statement of the *Cohen* test slightly, the underlying inquiry has remained relatively constant. "[T]he order must conclusively determine the disputed question, resolve an important issue completely separate from the merits of the action, and be effectively unreviewable on appeal from a final judgment." *Coopers & Lybrand* v. *Livesay*, 437 U. S. 463, 468 (1978).

We have always read the *Cohen* collateral order doctrine narrowly, in part because of the strong policies supporting

the § 1291 final judgment rule. The rule respects the responsibilities of the trial court by enabling it to perform its function without a court of appeals peering over its shoulder every step of the way. It preserves scarce judicial resources that would otherwise be spent in costly and time-consuming appeals. Trial court errors become moot if the aggrieved party nonetheless obtains a final judgment in his favor, and appellate courts need not waste time familiarizing themselves anew with a case each time a partial appeal is taken. Equally important, the final judgment rule removes a potent weapon of harassment and abuse from the hands of litigants. As Justice Frankfurter, writing for the Court in *Cobbledick* v. *United States*, 309 U. S. 323, 325 (1940), noted, the rule

> "avoid[s] the obstruction to just claims that would come from permitting the harassment and cost of a succession of separate appeals from the various rulings to which a litigation may give rise, from its initiation to entry of judgment. To be effective, judicial administration must not be leaden footed. Its momentum would be arrested by permitting separate reviews of the component elements in a unified cause."

In many cases in which a claim of right to immediate appeal is asserted, there is a sympathetic appellant who would undoubtedly gain from an immediate review of his individual claim. But lurking behind such cases is usually a vastly larger number of cases in which relaxation of the final judgment rule would threaten all of the salutory purposes served by the rule. Properly applied, the collateral order doctrine is necessary to protect litigants in certain narrow situations. Given the purposes of the final judgment rule, however, we should not relax its constraints unless we can be certain that all three of the *Cohen* criteria are satisfied. In this case, I find it unnecessary to address the first criterion—finality—because in my view a trial court's denial of qualified immunity

is neither "completely separate from the merits" nor "effectively unreviewable on appeal from a final judgment."

## A

Although the qualified immunity question in this suit is not identical to the ultimate question on the merits, the two are quite closely related. The question on the merits is whether Mitchell violated the law when he authorized the wiretap of Davidon's phone without a warrant. The immunity question is whether Mitchell violated clearly established law when he authorized the wiretap of Davidon's phone without a warrant. Assuming with the Court that all relevant factual disputes in this case have been resolved, a necessary implication of a holding that Mitchell was not entitled to qualified immunity would be a holding that he is indeed liable. Moreover, a trial court seeking to answer either question would refer to the same or similar cases and statutes, would consult the same treatises and secondary materials, and would undertake a rather similar course of reasoning. At least in the circumstances presented here, the two questions are simply not completely separate.

The close relationship between the immunity and merits questions is not a consequence of the special circumstances of this case. On the Court's view, there were no issues of material fact between the parties concerning the events surrounding the Davidon wiretap.[1] For that reason, both the immunity and the merits questions would be readily decidable on summary judgment. Yet a case with more divergence on the facts would present the same congruence of merits and immunity questions. If, for instance, the parties differed concerning whether Mitchell had in fact authorized the wiretaps, Mitchell would perhaps still have been able to

---

[1] As I point out in Part II, *infra*, the Court's view seriously misrepresents the dispute between the parties.

move for qualified immunity on the basis of undisputed facts. Nonetheless, even in such a case, the question whether the trial court should grant such a motion would have been closely related to the question whether the trial court should grant Mitchell a summary judgment motion on the merits, and *that* question is in no sense collateral to the ultimate question on the merits.[2]

I thus find the application of the second prong of the *Cohen* test to result in a straightforward preclusion of interlocutory appeal. Our prior cases confirm this result. In the past, we have found, *inter alia,* double jeopardy claims, *Abney* v. *United States,* 431 U. S. 651 (1977), claims of excessive bail, *Stack* v. *Boyle,* 342 U. S. 1 (1951), claims of absolute immunity, *Nixon* v. *Fitzgerald,* 457 U. S., at 742–743, and disputes concerning whether a defendant was required to post a security bond in certain circumstances, *Cohen* v. *Beneficial Industrial Loan Corp.,* 337 U. S. 541 (1949), to be separate from the merits of the underlying actions.[3] None of these

---

[2] I thus do not believe that mere "factual overlap," *ante,* at 529, n. 10, is sufficient to show lack of separability. Rather, it is the *legal* overlap between the qualified immunity question and the merits of the case that renders the two questions inseparable. As the text makes clear, when a trial court renders a qualified immunity decision on a summary judgment motion, it must make a legal determination very similar to the legal determination it must make on a summary judgment motion on the merits. Similarly, there may be cases in which, after all of the evidence has been introduced, the defendant official moves for a directed verdict on the ground that the evidence actually produced at trial has failed to make a factual issue of the question whether the defendant violated clearly established law. The trial court's decision on the defendant's directed verdict motion would involve legal questions quite similar to a motion by the defendant for a directed verdict on the merits of the case. The point is that, regardless of when the defendant raises the qualified immunity issue, it is similar to the question on the merits at the same stage of the trial. In contrast, the trial court's decision on absolute immunity or double jeopardy—at whatever stage it arises—will ordinarily not raise a legal question that is the same, or even similar, to the question on the merits of the case.

[3] See also *Helstoski* v. *Meanor,* 442 U. S. 500 (1979) (claim of immunity under Speech and Debate Clause); *Eisen* v. *Carlisle & Jacquelin,* 417

issues would necessarily be conclusive or even relevant to the question whether the defendant is ultimately liable on the merits.[4] Nor will a decision on any of these questions be likely to require an analysis, research, or decision that is at all related to the merits of the case.

In an attempt to avoid the rigors of the second prong of the collateral order doctrine, the Court holds that "a claim of immunity is *conceptually distinct from* the merits of the plaintiff's claim that his rights have been violated." *Ante,* at 527–528 (emphasis added). Our previous cases, especially those of recent vintage, have established a more exacting standard. The ordinary formulation is from *Coopers & Lybrand;* we stated there that an interlocutory order may be considered final for purposes of immediate appeal only if it "resolve[s] an important issue *completely separate from* the merits of the action." 437 U. S., at 468 (emphasis added). The Court has used this formulation in *Richardson-Merrell Inc.* v. *Koller, ante,* p. 424, *Flanagan* v. *United States,* 465 U. S. 259, 265 (1984), *United States* v. *Hollywood Motor Car Co.,* 458 U. S. 263, 265 (1982) *(per curiam),* and *Firestone Tire & Rubber Co.* v. *Risjord,* 449 U. S. 368, 375 (1981). In *Abney* v. *United States, supra,* we described the same factor by noting that the challenged order "resolved an issue com-

U. S. 156 (1974) (order allocating costs of notice in class action); *Swift & Co. Packers* v. *Compania Colombiana Del Caribe,* 339 U. S. 684 (1950) (order vacating attachment of ship in maritime case); *Roberts* v. *United States District Court,* 339 U. S. 844 (1950) (order denying *in forma pauperis* status).

[4] I do not suggest, as the Court seems to think, that double jeopardy or absolute immunity rulings are not "controlling" of the question whether the defendant will ultimately be liable. See *ante,* at 528, n. 9. Rather, these rulings are not generally conclusive or relevant to the question whether the defendant is liable *on the merits.* Of course double jeopardy or absolute immunity rulings can be outcome determinative, as could a ruling on qualified immunity—or on the application of a statute of limitations, a claim of improper venue, lack of subject-matter jurisdiction, failure to join an indispensable party, or the like. The question to be answered is not whether a given issue is outcome determinative, but whether its resolution is closely related to the resolution of the merits of the case.

*pletely collateral to* the cause of action asserted." *Id.*, at 658 (emphasis added).

Although the precise outlines of the "conceptual distinction" test are not made clear, the only support the Court has for its conclusion is the argument that "[a]ll [an appellate court] need determine is a question of law." *Ante*, at 528.[5] The underlying assumption of the Court's "conceptual distinction" test thus seems to be that questions of law are more likely to be separate from the merits of a case than are questions of fact. This seems to me to be entirely wrong; the legal, rather than factual, nature of a given question simply has nothing to do with whether it is separate from the merits. Although an appellate court *could* provide interlocutory review of legal issues, the final judgment rule embodies Congress' conclusion that appellate review of interlocutory legal and factual determinations should await final judgment. By focusing on the legal nature of the challenged trial court order, the Court's test effectively substitutes for the traditional test of *completely separate from* the merits a vastly less stringent analysis of whether the allegedly appealable issue is *not identical to* the merits.

Even if something less than complete separability were required, the Court's toothless standard disserves the im-

---

[5] The Court also states that "[a]n appellate court reviewing the denial of the defendant's claim of immunity need not consider the correctness of the plaintiff's version of the facts, nor even determine whether the plaintiff's allegations actually state a claim." *Ante*, at 528. The first part of this statement is correct, and would equally be true of any motion for judgment on the pleadings. Yet I have never seen a plausible argument that a motion for judgment on the pleadings is immediately appealable, in part because such a motion is plainly *not* separable from the merits of the case. The second part of the statement is also correct, and does indeed explain the difference between a qualified immunity determination and an ordinary motion for judgment on the pleadings or summary judgment motion. Yet the fact that a qualified immunity determination is *different* in some respect from a judgment on the pleadings is hardly ground for a finding that it is sufficiently separate to be immediately appealable.

portant purposes underlying the separability requirement.[6]
First, where a pretrial issue is entirely separate from the
merits, interlocutory review may cause delay and be unjusti-
fied on various grounds, but it at least is unlikely to require
repeated appellate review of the same or similar questions.
In contrast, where a pretrial issue is closely related to the
merits of a case and interlocutory review is permitted, post-
judgment appellate review is likely to require the appellate
court to reexamine the same or similar legal issues.   The
Court's holding today has the effect of requiring precisely
this kind of repetitious appellate review.   In an interlocutory
appeal on the qualified immunity issue, an appellate court
must inquire into the legality of the defendant's underlying
conduct.   As the Court has recently noted, "[m]ost pretrial
orders of district judges are ultimately affirmed by appellate
courts."   *Richardson-Merrell Inc.* v. *Koller, ante,* at 434.
Thus, if the trial court is, as usual, affirmed, the appellate
court must repeat the process on final judgment.   Although
I agree with the Court that the legal question in each review
would be "conceptually" different, the connection between
the research, analysis, and decision of each of the issues is
apparent; much of the work in reviewing the final judgment
would be duplicative.

A second purpose of the separability requirement derives
from our recognition that resolution of even the most ab-
stract legal disputes is advanced by the presence of a con-

---

[6] The "conceptual distinction" test is also inconsistent with the Court's
decision in *Richardson-Merrell Inc.* v. *Koller, ante,* p. 424.   The Court
here notes that "a question of immunity is separate from the merits of the
underlying action for purposes of the *Cohen* test even though a reviewing
court must consider the plaintiff's factual allegations in resolving the immu-
nity issue."   *Ante,* at 528–529.   Yet the *Richardson-Merrell* Court evi-
dently believes that the attorney disqualification issue is not separable
from the merits because the court of appeals must evaluate, *inter alia,*
"respondent's claim on the merits, [and] the relevance of the alleged
instances of misconduct to the attorney's zealous pursuit of that claim."
*Ante,* at 440.

crete set of facts.  If appeal is put off until final judgment, the fuller development of the facts at that stage will assist the appellate court in its disposition of the case.  Simply put, an appellate court is best able to decide whether given conduct was prohibited by established law if the record in the case contains a full description of that conduct.  See *Kenyatta* v. *Moore*, 744 F. 2d 1179, 1185–1186 (CA5 1984).

In short, the Court's "conceptual distinction" test for separability finds no support in our cases and fails to serve the underlying purposes of the final judgment rule.  To the extent it requires that only trial court orders concerning matters of law be appealable, it requires only what I had thought was a condition of *any* appellate review, interlocutory or otherwise.  The additional thrust of the test seems to be that an appealable order must not be identical to the merits of the case.  If the test for separability is to be this weak, I see little profit in maintaining the fiction that it remains a prerequisite to interlocutory appeal.

B

The Court states that "[a]t the heart of the issue before us," *ante*, at 525, is the third prong of the *Cohen* test: whether the order is effectively unreviewable upon ultimate termination of the proceedings.  The Court holds that, because the right to qualified immunity includes a right not to stand trial unless the plaintiff can make a material issue of fact on the question of whether the defendant violated clearly established law, it cannot be effectively vindicated *after* trial.  Cf. *Abney* v. *United States*, 431 U. S. 651 (1977).

If a given defense to liability in fact encompasses a right not to stand trial under the specified circumstances, one's right to that defense is effectively unreviewable on appeal from final judgment.  For instance, if one's right to summary judgment under Federal Rule of Civil Procedure 56 were characterized as a right not to stand trial where the op-

posing party has failed to create a genuine issue of material fact, denials of summary judgment motions would be immediately appealable, at least under the third prong of the *Cohen* test. Similarly, if the statute of limitations gave defendants a right not to be tried out of time, denial of a statute of limitations defense would be immediately appealable insofar as the third *Cohen* test is concerned. Similar results would follow with a host of constitutional (*e. g.*, right to jury trial, right to due process), statutory (*e. g.*, venue, necessary parties), or other rights; if the right be characterized as a right not to stand trial except in certain circumstances, it follows ineluctably that the right cannot be vindicated on final judgment.

The point, of course, is that the characterization of the right at issue determines the legal result. In each case, therefore, a careful inquiry must be undertaken to determine whether it is necessary to characterize the right at issue as a right not to stand trial. The final judgment rule presupposes that each party must abide by the trial court's judgments until the end of the proceedings before gaining the opportunity for appellate review. To hold that a given legal claim is in fact an immunity from trial is to except a privileged class from undergoing the regrettable cost of a trial. We should not do so lightly.

The Court states that *Harlow* v. *Fitzgerald*, 457 U. S. 800 (1982), extended the qualified immunity doctrine in part to avoid imposition of "the general costs of subjecting officials to the risks of trial—distraction of officials from their governmental duties, inhibition of discretionary action, and deterrence of able people from public service." *Id.*, at 816. In *Harlow*, however, we chose to advance this purpose by modifying the substantive standards governing qualified immunity. By making the defense easier to prove on a summary judgment motion, *Harlow* did relieve many officials of undergoing the costs of trial. Yet *Harlow* fails to answer the question before the Court today: Having given extra protection to public officials by adjusting liability standards

in *Harlow*, need we in addition take the extraordinary step of excepting such officials from the operation of the final judgment rule?

The Court advances three grounds in support of its result. First, it notes that a defendant government official is entitled to dismissal if the plaintiff fails to state a claim of violation of clearly established law. *Ante*, at 526. This, although true, merely restates the standard of liability recognized in *Harlow;* it fails to justify the additional step taken by the Court today. Second, the Court states that a defendant official is entitled to summary judgment if the plaintiff is unable to create a genuine issue of material fact on this issue. This is also true, but again merely restates the ordinary standard for summary judgment under Rule 56(c).[7] Finally, the Court declares that "[t]he entitlement is an *immunity from suit* rather than a mere defense to liability," and is thus lost if a case is erroneously permitted to go to trial. *Ante*, at 526. Although the Court may believe that italicizing the words "immunity from suit" clarifies its rationale, I doubt that the ordinary characterization of a wide variety of legal claims as "immunities"[8] establishes that trial court orders rejecting

---

[7] "The judgment sought [in a summary judgment motion] shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. Rule Civ. Proc. 56(c).

[8] The numerous legal rights traditionally recognized as immunities include everything from the now-dormant charitable immunity in tort law, W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts § 133 (5th ed. 1984), to the state-action immunity in antitrust law, see *Parker* v. *Brown*, 317 U. S. 341 (1943), and the doctrine of sovereign immunity. Federal statutes also contain numerous provisions granting immunities. See, *e. g.*, 15 U. S. C. § 78iii(b) (good-faith immunity for self-regulatory organizations from liability for disclosures relating to financial difficulties of certain securities dealers); 33 U. S. C. § 1483 (immunity for foreign government vessels from pollution control remedies); 46 U. S. C. § 1304 (immunities of carrier of goods by sea); 46 U. S. C. App. § 1706

such claims are necessarily unreviewable at the termination of proceedings.

In my view, a sober assessment of the interests protected by the qualified immunity defense counsels against departing from normal procedural rules when the defense is asserted. The Court claims that subjecting officials to trial may lead to " 'distraction of officials from their governmental duties, inhibition of discretionary action, and deterrence of able people from public service.' " *Ante,* at 526, quoting *Harlow* v. *Fitzgerald, supra,* at 816. Even if I agreed with the Court that in the post-*Harlow* environment these evils were all real, I could not possibly agree that they justify the Court's conclusion. These same ill results would flow from an adverse decision on *any* dispositive preliminary issue in a lawsuit against an official defendant—whether based on a statute of limitations, collateral estoppel, lack of jurisdiction, or the like. A trial court is often able to resolve these issues with considerable finality, and the trial court's decision on such questions may often be far more separable from the merits than is a qualified immunity ruling. Yet I hardly think the Court is prepared to hold that a government official suffering an adverse ruling on any of these issues would be entitled to an immediate appeal.

In any event, I do not think that the evils suggested by the Court pose a significant threat, given the liability standards established in *Harlow.* We held in *Harlow* that "government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." 457 U. S., at 818. I have no doubt that trial judges employing this standard will have little difficulty in achieving *Harlow*'s goal of early dismissal of frivolous

---

(1982 ed., Supp. III) (immunity from antitrust laws for certain agreements among carriers of goods by sea).

or insubstantial lawsuits. The question is whether anything is to be gained by permitting interlocutory appeal in the remaining cases that would otherwise proceed to trial.

Such cases will predictably be of two types. Some will be cases in which the official *did* violate a clearly established legal norm. In these cases, nothing is to be gained by permitting interlocutory appeal because they should proceed as expeditiously as possible to trial. The rest will be cases in which the official did not violate a clearly established legal norm. Given the nature of the qualified immunity determination, I would expect that these will tend to be quite close cases, in which the defendant violated a legal norm but in which it is questionable whether that norm was clearly established. Many of these cases may well be appealable as certified interlocutory appeals under 28 U. S. C. § 1292(b) or, less likely, on writ of mandamus. Cf. *Firestone Tire & Rubber Co.* v. *Risjord*, 449 U. S., at 378, n. 13; *Coopers & Lybrand* v. *Livesay*, 437 U. S., at 474–475. It is only in the remaining cases that the Court's decision today offers the hope of an otherwise unavailable pretrial reversal. Out of this class of cases, interlocutory appeal is beneficial only in that still smaller subclass in which the trial court's judgment is reversed.

The question is thus whether the possibly beneficial effects of avoiding trial in this small subset of cases justify the Court's declaration that the right to qualified immunity is a right not to stand trial at all. The benefits seem to me to be rather small. Most meritless cases will be dismissed at the early stages, thus minimizing the extent to which officials are distracted from their duties. Officials aware of the extensive protection offered by qualified immunity would be deterred only from activities in which there is at least a strong scent of illegality; deterrence from many such activities (those that are clearly unlawful) is precisely one of the goals of official liability. Finally, I cannot take seriously the Court's suggestion that officials who would otherwise be deterred from taking public office will have their confidence

restored by the possibility that mistaken trial court qualified immunity rulings in some small class of cases that might be brought against them will be overturned on appeal before trial.

Even if there were some benefits to be gained by granting officials a right to immediate appeal, a rule allowing immediate appeal imposes enormous costs on plaintiffs and on the judicial system as a whole.[9]  Most claims entitled to immediate appeal have a self-limiting quality.  See *United States* v. *MacDonald,* 435 U. S. 850, 862 (1978) (relying in part on the fact that "there is nothing about the circumstances that will support a speedy trial claim which inherently limits the availability of the claim" to find it not appealable).  Double jeopardy claims, for instance, are available only to criminal defendants who have been previously tried.  Similarly, the interlocutory civil appeals the Court permitted in *Cohen* are obviously limited to a small number of cases.  See also *Helstoski* v. *Meanor,* 442 U. S. 500 (1979) (Speech and Debate Clause immunity); *Swift & Co. Packers* v. *Compania Colombiana Del Caribe,* 339 U. S. 684 (1950) (order denying attachment of ship); *Roberts* v. *United States District Court,* 339 U. S. 844 (1950) *(per curiam)* (order denying right to proceed *in forma pauperis*).  Although absolute immunity is perhaps a more widely available claim, its ambit nonetheless remains restricted to officials performing a few extremely sensitive functions.  See, *e. g., Nixon* v. *Fitzgerald,* 457 U. S. 731 (1982) (the President); *Imbler* v. *Pachtman,* 424 U. S. 409 (1976) (prosecutors); *Pierson* v. *Ray,* 386 U. S. 547 (1967) (judges); *Tenney* v. *Brandhove,* 341 U. S. 367 (1951) (legislators).  In contrast, the right to interlocutory appeal recognized today is generally available to (and can be expected to be widely pursued by) virtually any governmental

---

[9] It also imposes costs on the defendant officials and the public.  Those who pursue interlocutory appeals can be expected ordinarily to lose.  See *Richardson-Merrell Inc.* v. *Koller, ante,* p. 424.  Permitting an interlocutory appeal will thus in most cases merely divert officials from their duties for an even longer time than if no such appeals were available.

official who is sued in his personal capacity,[10] regardless of the merits of his claim to qualified immunity or the strength of the claim against him. As a result, I fear that today's decision will give government officials a potent weapon to use against plaintiffs, delaying litigation endlessly with interlocutory appeals.[11] The Court's decision today will result in denial of full and speedy justice to those plaintiffs with strong claims on the merits and a relentless and unnecessary increase in the caseload of the appellate courts.

## II

Even if I agreed with the Court's conclusion that denials of qualified immunity that rest on undisputed facts were immediately appealable and further agreed with its conclusion that Mitchell was entitled to qualified immunity,[12] I could not agree with the Court's mischaracterization of the proceedings in this case to find that Mitchell was entitled to summary judgment on the qualified immunity issue. From the outset, Forsyth alleged that the Davidon wiretap was not a national security wiretap, but was instead a simple attempt to spy on political opponents. This created an issue of fact as to the nature of the wiretap in question, an issue that the trial court never resolved. To hold on this record that Mitchell was entitled to summary judgment is either to engage in *de novo* factfinding—an exercise that this Court has neither the authority nor the resources to do—or intentionally to disregard the record below to achieve a particular result in this case.

---

[10] Of course, an official sued in his official capacity may not take advantage of a qualified immunity defense. See *Brandon* v. *Holt*, 469 U. S. 464 (1985).

[11] The instant case is an apt illustration. The proceedings in the trial court would likely have concluded in 1979 were it not for the two interlocutory appeals filed by the Government.

[12] Given my conclusion that the Court of Appeals had no jurisdiction over Mitchell's interlocutory appeal, I need not reach the issue of whether he was entitled to qualified immunity.

The Court purports to find two justifications for its conclusion that the trial court in fact resolved this issue in Mitchell's favor. It states: "The District Court held a hearing on the purpose of the wiretap and took Mitchell at his word that the wiretap was a national security interception, not a prosecutorial function for which absolute immunity was recognized." *Ante*, at 535, n. 13. This is true, but fails to demonstrate any resolution of the disputed factual issue. In its 1982 ruling, the trial court indeed said that it "has taken defendant Mitchell at his word" when he claimed that he approved the Davidon wiretaps as part of a national security investigation. App. to Pet. for Cert. 59a. In this section of its opinion, reproduced *id.*, at 56a–60a, the trial court was determining whether Mitchell was entitled to absolute immunity *as a prosecutor* in authorizing the Davidon wiretap. Thus, two paragraphs below the quoted statement, the trial court said:

> "[R]egardless of whether the Davidon wiretap was motivated by a legitimate national security concern or a good faith belief that there existed a legitimate national security concern, as the defendants contend, *or was an invasion of the privacy of political dissidents conducted under the guise of national security, as the plaintiff contends*, there is no doubt that defendant Mitchell has consistently taken the position that the Davidon tap 'arose in the context of a purely investigative or administrative function' on his part." *Id.*, at 59a (emphasis added).

The trial court quite properly took Mitchell "at his word" for purposes of ruling against him on his prosecutorial immunity claim. It would have been quite improper for the court to take Mitchell "at his word" for any other purpose, and the court never made its own finding of fact on the disputed issue.

The Court also attempts to construct an argument that the trial court, as a matter of logic, must have made the finding of fact in question. Otherwise, according to the Court, "the

qualified immunity question would never have been reached, for the tap would clearly have been illegal under Title III, and qualified immunity hence unavailable." *Ante*, at 535, n. 13. The Court's argument seems to be that the trial court should have decided the legality of the wiretap under Title III before going on to the qualified immunity question, since that question arises only when considering the legality of the wiretap under the Constitution. Perhaps the trial court should have proceeded as the Court wants, although the question is not nearly so simple as the Court suggests, and I would have thought that a trial court in a complicated case must be accorded great discretion in determining its order of decision. At any rate, speculations as to what the trial court ought to have decided and in what order are irrelevant; Forsyth surely should not forfeit his legal claim because (arguably) the trial court went about its task inartfully. There is not a word in this record to suggest that the trial court actually made any determination on the disputed issue. I am thus at a loss to understand on what legal principle, aside from sympathy for the defendant or hostility to the plaintiff, the Court bases its decision that Mitchell was entitled to summary judgment.

I dissent.