**United States Court of Appeals**
**FOR THE EIGHTH CIRCUIT**

_____

No. 96-3291

_____

| | | |
|---|---|---|
| Virgie Lee Otey, Administratrix of the Estate of Charles Otey, deceased, | * * * | |
| Appellee, | * * | |
| v. | * * * | Appeal from the United States District Court for the Eastern District of Arkansas. |
| Melvin Marshall, Individually and in his official capacity as a Law Enforcement Officer in the City of Elaine Police Department, Phillips County, Arkansas; Larry Smith, Individually and in his Official Capacity as Chief of Police of the City of Elaine, Arkansas Police Department, | * * * * * * * * * | |
| Appellants. | * | |

_____

Submitted: April 18, 1997
Filed: July 30, 1997

_____

Before LOKEN, MAGILL, and MORRIS SHEPPARD ARNOLD, Circuit Judges.

_____

MAGILL, Circuit Judge.

Larry Smith was the police chief of Elaine, Arkansas, when Charles Otey was killed by an Elaine police officer. The administrator of Otey's estate brought this 42

U.S.C. § 1983 (1994) suit against Chief Smith, alleging that Chief Smith had failed to supervise and train the officer who had killed Otey. Chief Smith moved the district court for summary judgment on the ground of qualified immunity, and the district court denied the motion. Chief Smith now appeals the district court's denial of summary judgment, and we reverse.

## I.

Elaine, Arkansas, is a small community near the Mississippi border. On December 8, 1994, Elaine's police force consisted of Chief Smith and two part-time officers. One of these part-time officers was Melvin Marshall, who also worked as a janitor for the Elaine school system. Pursuant to Arkansas state regulations, Officer Marshall had taken a 100-hour law-enforcement training course to qualify as a part-time officer.

On the afternoon of December 8, 1994, Officer Marshall was off-duty and relaxing in his home in Elaine. At approximately 5:20 p.m., Officer Marshall heard several gunshots somewhere in his neighborhood. Such gunshots were not uncommon in Officer Marshall's neighborhood, and Officer Marshall had made it a practice to investigate such gunshots when they occurred. Accordingly, Officer Marshall placed his .357 magnum service revolver in his pocket, picked up his badge, and went to investigate the shots.

Officer Marshall was told by a neighbor that the shots had come from an alley near his house. Entering the alley, Officer Marshall saw two African-American

males at the far end of the alley.  Officer Marshall saw one of these men fire a handgun into the air.  The shots were then answered by several gunshots from a nearby housing

project.  The men then left the alley.[1]  Officer Marshall drew his service revolver from his pocket, cocked it, and held it in the air.  He then attempted to pursue the two men who had been in the alley.  Officer Marshall took a different route, going across an empty lot, to try to cut them off.

At this time, Otey, who was fifteen years old, and his fourteen-year-old friend Cyrus Thomas were on a nearby street running from the gunshots.  Officer Marshall saw the two boys running and yelled for them to stop.  Thomas heard the order and stopped, while Otey continued running.  Officer Marshall's service revolver discharged, and Otey was shot in the back.

Officer Marshall contends that he jumped a four-foot ditch between the empty lot and the street.  Officer Marshall alleges that his foot slipped when he landed after his jump.  As he recovered his balance, his weapon discharged accidentally.  See J.A. at 107-10.  Several witnesses support this version of the facts.  See id. at 139 (signed statement of Curley Marshall) ("I saw Melvin [Marshall] running and jumping the ditch and when he did his gun went off and the boy fell in the street."); 144

---

[1]Officer Marshall offered this version of events during his deposition.  See J.A. at 86-87.  While proffering no evidence to contradict Officer Marshall's description of events in the alley, the appellee contends that Officer Marshall did not see anyone fire a handgun into the air.  See Appellee's Br. at 1.  Contrary to the appellee's apparent belief, a party litigant may not generate a question of material fact out of uncontradicted evidence merely by speculating that a witness is lying.  Cf. FDIC v. Bell, 106 F.3d 258, 265 n.9 (8th Cir. 1997) ("We do not allow a case to go forward to trial on the mere chance that a jury will disregard all evidence and accept the unsupported speculation of a party litigant.").

-4-

(statement of Alvin White) ("I saw Melvin [Marshall] jump the ditch and I saw him almost fall[;] it was like he almost slipped backwards.  The shot was when Melvin was at the ditch.").

The appellee contends that Officer Marshall shot Otey intentionally. Several witnesses also support this version of the facts. See J.A. at 204 (affidavit of Earnestine Broadus) ("I was looking directly at Melvin Marshall when he fired the fatal shot into Charles Otey. Melvin Marshall was not tripping, falling or stumbling at the time he discharged his revolver into Charles Otey's back. In fact, Melvin Marshall was standing upright on Lee Street, which is paved.")[2]; 212 (deposition of Cyrus Thomas) (testifying that, although he did not see Officer Marshall fire his service revolver, Thomas looked at Officer Marshall immediately after Officer Marshall fired and that Officer Marshall did not "appear to have fallen or tripped or done anything").

Otey fell to the street after being shot. Officer Marshall then retrieved a loaded .25 caliber automatic pistol from Otey's back pocket.[3] Otey subsequently died from his gunshot wound.

Chief Smith was immediately notified of the shooting by Officer Marshall. Chief Smith contacted the Arkansas

---

[2]Arkansas State Police Field Investigator Barry Roy, who investigated the shooting, allegedly transcribed a statement from Earnestine Broadus that was considerably different from her affidavit. In the statement, Broadus allegedly told Investigator Roy that she "heard Melvin [Marshall] when he hollered at the boys[.] I was looking out my window to see what was going on and I saw Melvin coming across the ditch and almost fall. The gun made a flash when Melvin slipped and almost fell." J.A. at 140. In her affidavit, Broadus asserts that she "never told Barry Roy that Melvin Marshall shot Charles Otey while falling." Id. at 204.

[3]Although Otey was armed, it does not appear that he had recently fired the .25 caliber automatic pistol. There were no spent shell casings discovered in the nearby alley, nor was gunpowder residue discovered on Otey's hands.

State Police and turned the investigation of the shooting over to them.  Officer Marshall was put on administrative leave during the pendency of the investigation, which was conducted by Field Investigator Barry Roy of the Arkansas State Police.

Investigator Roy arrived in Elaine on the evening of December 8, 1994. Investigator Roy interviewed witnesses, took a statement from Officer Marshall, and searched the area of the shooting for physical evidence. Based on his investigation, Investigator Roy declined to arrest Officer Marshall in connection with the shooting. On December 29, 1994, the prosecuting attorney for the First Judicial District of Arkansas also declined to bring criminal charges against Officer Marshall in connection with the shooting.

On July 21, 1995, Virgie Otey, who was Otey's mother and who is also the administrator of Otey's estate, brought § 1983 and pendant state tort claims against Officer Marshall and Chief Smith in their individual and official capacities. The § 1983 action alleged that Officer Marshall had unreasonably seized Otey, in violation of the Fourth Amendment, by intentionally shooting him. The lawsuit also alleged that Chief Smith was deliberately indifferent to Otey's constitutional rights by failing to adequately train and supervise Officer Marshall.[4]

---

[4]Specifically, the appellee alleged that:

Chief Larry Smith was deliberately indifferent to the rights of Charles Otey and other citizens by his failure to adequately train, supervise, and discipline Officer Melvin Marshall and other officers; and in his failure to take preventative or remedial measures to prevent acts of violence by officers under his command, having knowledge of such propensities by officers, including Melvin Marshall of the city of Elaine, Arkansas Police Department.

Chief Larry Smith knew or reasonably should have known of other

-8-

It was revealed during discovery that the Elaine Police Department had a policy on the use of deadly force in place at the time of Otey's shooting. This policy provided that:

>     Use of deadly Force by a member of this Department against a person is limited to the following:
>
>     (1) To effect an arrest or to prevent the escape from custody of an arrested person, who, the officer reasonably believes: (a) has committed or attempted to commit a felony, (b) which involved the use or threatened use of deadly force and (c) the felon cannot other[wise] be apprehended.
>
>     (2) To effect an arrest or to prevent the escape from custody of an arrested person who

_____

propensities for violent misconduct, and other violations of citizens['] constitutional rights by Officer Melvin Marshall, and was deliberately indifferent in failing to promote and promulgate customs and policies of a preventative or remedial nature.

Chief Larry Smith was deliberately indifferent in failing to establish and enforce adequate policies and customs regarding the prevention, investigation, and discipline of violent misconduct of officers working for the city of Elaine, Arkansas Police Department, and instead encouraged such behavior by his customs and policies amounting to acquiescence and indifference to violations of citizens['] constitutional rights.

The deliberate indifference herein was in accordance with the customs, policies, and procedures of the city of Elaine, Arkansas Police Department and Chief Larry Smith.

Compl. at ¶¶ 14-17 (paragraph numeration omitted), reprinted in J.A. at 10-11.

the officer reasonably believes: (a) has committed or attempted to commit a felony, (b) would use deadly force if not immediately apprehended, and (c) the felon cannot otherwise be apprehended.

(3) To defend himself or a third person from what he reasonably believe to be the use or imminent use of deadly force.

(4)  No deadly force may be used against an escaping misdemeanant.

(5)  The use of "warning shots" is prohibited.

J.A. at 193.  On February 2, 1992, Officer Marshall signed a statement that he had read and understood the policy.[5]

In his deposition, Officer Marshall testified that he had once violated the city's policy against the use of warning shots.  See J.A. at 225-26.  While investigating a disturbance at a dance hall, Officer Marshall had fired two shots in the air to disperse a hostile crowd after a bottle had been thrown at the officer.  See id.  Although Chief Smith was aware of the incident, he did not discipline or counsel Officer Marshall for the violation of the policy.

On April 24, 1996, Carolyn Dunigan, the Recorder for the City of Elaine, described in an affidavit the results of her search of city records.  Dunigan stated that, although the records listed 920 citizen contacts with the police over the last five years, including 695 arrests, "[n]o citizen complaints about excessive force (deadly or otherwise) have been made against any member of the

_____

[5]Chief Smith asserts that deadly force has not been used by an Elaine police officer during the past five years, except for Officer Marshall's alleged use of deadly force against Otey.  See Appellant's Br. at 16-17.  The appellee does not challenge this assertion, but suggests that "[t]he City of Elaine simply has been very fortunate that this is the first incident of illegal deadly force perpetrated upon a juvenile."  Appellee's Br. at 11.

Elaine Police Department, including Melvin Marshall, in the last five (5) years."  J.A. at 192 (parentheticals in original).  In a deposition, Chief Smith described his procedure for handling complaints against the police department.  Chief Smith explained that, "[u]nder normal circumstances, they [the complainants] could come in and sit down with me and file

that complaint with me . . . . We would take a statement and then we'd do, like, file an affidavit. They would sign that affidavit." <u>Id.</u> at 179. If Chief Smith was a subject of the complaint, he would refer the complainant to a different law enforcement agency. <u>Id.</u>

The appellee contends that there have been complaints of excessive force levied against the Elaine Police Department. In an affidavit signed May 10, 1996, Rosie Cooper stated that:

> I and my two children, Clifton Green and Anissia Johnson, have complained of Melvin Marshall using excessive force against Anissia and Clifton. Both of my children testified in court of the use of this excessive force. Larry Smith was aware of our complaint. As far as I know, nothing was done about the incident.

J.A. at 244.

Officer Marshall and Chief Smith moved for summary judgment on the ground of qualified immunity. The district court denied the motion, stating:

> In this case, the facts surrounding the shooting are contested. One issue in dispute is whether the shooting was accidental. In sum, this case is not appropriate for summary judgment.
>
> The defendants raise the affirmative defense of qualified immunity. The plaintiff contends that Charles Otey, a ninth-grade student, was intentionally shot in the back as he ran from Officer Marshall. This does not involve a legal

-13-

premise that was unclear at the time of the incident.  Qualified immunity is inapplicable.

Mem. Op. (Aug. 16, 1996) at 2, reprinted in Appellant's Add. at 2. The district court did not specifically address Chief Smith's qualified immunity from the lawsuit. Chief Smith now appeals.

## II.

The appellee challenges our jurisdiction in this matter. We conclude that we may properly exercise jurisdiction over this appeal.

Other than certain enumerated interlocutory decisions, see 28 U.S.C. § 1292 (1994), this Court has jurisdiction only over appeals of the final orders of district courts. See 28 U.S.C. § 1291 (1994). Accordingly, this Court normally does not have jurisdiction over a district court's denial of a summary judgment motion. See Miller v. Schoenen, 75 F.3d 1305, 1308 (8th Cir. 1996).

The Supreme Court has held, however, that certain interlocutory orders "which finally determine claims of right separable from, and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated," may be treated as final for appellate jurisdiction. Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541, 546 (1949) (creating the collateral order doctrine). A qualified immunity defense "shields government agents from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which

a reasonable person would have known." Behrens v. Pelletier, 116 S. Ct. 834, 838 (1996) (quotations, alterations, and citations omitted). This immunity is "an entitlement not to stand trial or face the other burdens of litigation, conditioned on the resolution of the essentially legal immunity question." Id. at 838-39 (quotations, alteration, and citation omitted). In light of this right not to face trial, the Supreme Court has held that a district court's denial of a summary judgment motion based on a qualified immunity defense, "to the extent that it turns on an issue of law," is an

immediately appealable decision under the collateral order doctrine.  <u>Mitchell v. Forsyth</u>, 472 U.S. 511, 530 (1985) (holding that the issue of whether a constitutional right had been clearly established at the time of its alleged violation is immediately appealable).

In <u>Johnson v. Jones</u>, 115 S. Ct. 2151 (1995), the Supreme Court emphasized that, to immediately appeal a denial of a summary judgment motion based on qualified immunity, the issue immediately appealed must be a question of law.  <u>See</u> <u>id.</u> at 2158.  The <u>Johnson</u> Court held that an official defendant asserting a qualified immunity defense could not immediately appeal a district court's denial of summary judgment where the district court's "order determines whether or not the pretrial record sets forth a 'genuine' issue of fact for trial." <u>Id.</u> at 2159.

In <u>Behrens</u>, the Court clarified its holding in <u>Johnson</u>, noting that a "[d]enial of summary judgment often includes a determination that there are controverted issues of material fact, and <u>Johnson</u> surely does not mean that <u>every</u> such denial of summary judgment is nonappealable."  116 S. Ct. at 842 (citation omitted). Rather, <u>Johnson</u> held

> that determinations of evidentiary sufficiency at summary judgment are not immediately appealable merely because they happen to arise in a qualified-immunity case; if what is at issue in the sufficiency determination is nothing more than whether the evidence could support a finding that particular conduct occurred, the question decided is not truly "separable" from the plaintiff's claim, and

-17-

hence there is no "final decision" under <u>Cohen</u> and <u>Mitchell</u>.  <u>Johnson</u> reaffirmed that summary-judgment determinations <u>are</u> appealable when they resolve a dispute concerning an abstract issue of law relating to qualified immunity--typically, the issue whether the federal right allegedly infringed was clearly established . . . .

<u>Id.</u> (quotations, alteration, and citations omitted).

In the instant case, the district court denied summary judgment to Officer Marshall because there remains the question of material fact of whether Officer Marshall intentionally shot Otey. See Mem. Op. at 2, reprinted in Appellant's Add. at 2. Officer Marshall has not appealed this decision, and we presume, for purposes of this appeal, that Officer Marshall could be liable for violating Otey's Fourth Amendment rights by unreasonably seizing Otey through the use of deadly force. See Tennessee v. Garner, 471 U.S. 1 (1985) (Fourth Amendment prohibits use of deadly force to stop the escape of a suspect who poses no threat).

That a question of material fact remains as to Officer Marshall's liability does not, however, answer whether Chief Smith has qualified immunity in this matter. To overcome Chief Smith's entitlement to qualified immunity, the appellee must allege, and present evidence that could support, that Chief Smith himself violated a well-established constitutional right of Otey. Whether the appellee has met this burden does not require this Court to weigh the sufficiency of the evidence to support the appellee's claim against Chief Smith. Rather, this question requires us to undertake the legal analysis of whether the appellee's allegations and the evidence presented, taken in the light most favorable to the appellee, present a claim that Chief Smith violated a well-established right of Otey. Under Mitchell, we conclude that this Court has jurisdiction to determine whether the appellee has met this burden. See 472 U.S. at 530.

In denying summary judgment to Chief Smith, the district court did not specify what facts it assumed regarding Chief Smith's right to qualified immunity and what, if any, questions of material fact remain regarding Chief Smith's right to qualified immunity. Accordingly, it is somewhat difficult for this Court to "know what set of facts to assume when [we] answer[] the purely legal question about 'clearly established' law . . . ." Johnson, 115 S. Ct. at 2159. In such a circumstance, the Supreme Court has directed us "to undertake a cumbersome review of the record to determine what facts the district court, in the light most favorable to the nonmoving party, likely assumed." Id.

## III.

The appellee has alleged that Chief Smith is liable for violating Otey's constitutional rights because of Chief Smith's alleged failure to train, supervise, and discipline Officer Marshall.  We conclude that Chief Smith did not "violate clearly established statutory or constitutional rights of which a reasonable person would have known," Behrens, 116 S. Ct. at 838 (quotations and citations omitted), and is therefore entitled to qualified immunity for this claim.

Section 1983 liability cannot attach to a supervisor merely because a subordinate violated someone's constitutional rights.  See City of Canton v. Harris, 489 U.S. 378, 385 (1989) ("Respondeat Superior or vicarious liability will not attach under § 1983.").  Rather, Chief Smith can be liable for Officer Marshall's constitutional violation only "if he directly participated in the constitutional violation, or if his failure to train or supervise the offending actor caused the deprivation . . . ." Tilson v. Forrest City Police Dep't, 28 F.3d 802, 806 (8th Cir. 1994) (citations omitted).

There is no allegation in this case that Chief Smith ordered Officer Marshall to shoot Otey or otherwise directly participated in Officer Marshall's alleged violation of Otey's constitutional rights.  Rather, the appellee alleges that Chief Smith is liable for failing to supervise and train Officer Marshall.  For Chief Smith to have violated Otey's constitutional rights by failing to supervise Officer Marshall, it must be shown that Chief Smith:

(1)     Received   notice   of   a   pattern   of unconstitutional acts committed by subordinates;

(2)  Demonstrated deliberate indifference to or tacit authorization of the offensive acts;

(3)  Failed to take sufficient remedial action; and

(4)  That such failure proximately caused injury to [Otey].

Jane Doe A. v. Special Sch. Dist. of St. Louis County, 901 F.2d 642, 645 (8th Cir. 1990).

In this case, the appellee has pointed to two pieces of evidence that Chief Smith had received notice that Officer Marshall was prone to using excessive force. Officer Marshall had once fired warning shots to quell a disturbance at a dance hall, an action that directly violated Elaine Police Department procedure.  In addition, Rosie Cooper alleged in an affidavit that her two children had complained of Officer Marshall using excessive force and that Chief Smith knew of these complaints.  The appellee alleges that in neither of these cases did Chief Smith discipline or counsel Officer Marshall.

Assuming that these allegations are true, we conclude that they fail to state a violation by Chief Smith of Otey's constitutional rights.  Officer Marshall's use of warning shots did not put Chief Smith on notice that Officer Marshal engaged in a pattern of unconstitutional acts.  While prohibited by Elaine Police Department policy, Officer Marshall's use of warning shots simply did not violate anyone's constitutional rights.  Although it may be an unwise practice to fire gunshots into the air to quell an unruly crowd, there is no evidence that Officer Marshall seized anyone--unconstitutionally or otherwise--when he fired warning shots at the dance hall. See J.A. at  226 (deposition of Officer Marshall)

(testifying that, following warning shots, crowd dispersed, and that no arrests were made).

Moreover, Rosie Cooper's affidavit does not state when excessive force was allegedly used, what the alleged excessive force consisted of, nor when the complaints of excessive force were allegedly made. Without some indication that these complaints were made prior to Otey's death, there is simply no evidentiary support for the allegation that Chief Smith was on notice of the alleged violations. Without such

notice, Chief Smith cannot be liable for Officer Marshall's alleged constitutional violations.

In Harris, the Supreme Court explained that "the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." 489 U.S. at 388. We have held that:

> It is necessary to show that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need. In other words, the plaintiff must demonstrate that the city had notice that its procedures were inadequate and likely to result in a violation of constitutional rights.

Andrews v. Fowler, 98 F.3d 1069, 1076 (8th Cir. 1996) (quotations and citations omitted).

Rather than demonstrating indifference to Otey's constitutional right not to be seized unreasonably through the use of deadly force, all of the evidence in this case demonstrates that Chief Smith and the Elaine Police Department had specifically trained Officer Marshall only to use deadly force in a manner consistent with the constitution. Compare Garner, 471 U.S. at 11 ("Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of

deadly force to do so."), with J.A. at 193 (Elaine Police Department policy on use of deadly force) (deadly force may be used only where a suspect has used, threatened to use, or is likely to use deadly force against arresting officer or third person).  It is undisputed that the policy had been communicated to Officer Marshall, and that Officer Marshall had signed the Elaine Policy Department policy, indicating that he had read and understood the policy.  See id.

In sum, based on the facts alleged by the appellee, Chief Smith did not violate any well-established constitutional right held by Otey. Because Chief Smith did not violate any well-established constitutional right, he is entitled to qualified immunity for the appellee's claims for civil damages. Accordingly, we reverse the district court's denial of summary judgment on the claims against Chief Smith in his private and official capacities.

A true copy.


Attest:


CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.