**Dan Red OWL, Roxanne Whipple, Plaintiffs,**

v.

**Dale ROBERTSON, Don Henry, Wes Eisenbeiss, County of Knox, Nebraska, Defendants.**

No. 4:99CV3072.

United States District Court, D. Nebraska.

Jan. 12, 2000.

Dana L. Hanna, White River, SD, for plaintiffs.

Richard L. Boucher, Kimberly K. Sturzenegger, Boucher Law Firm, Lincoln, NE, for defendants.

## MEMORANDUM AND ORDER

KOPF, Chief Judge.

The plaintiffs, Dan Red Owl (Owl) and Roxanne Whipple (Whipple), have filed a motion for summary judgment against Dale Robertson (Robertson). I will deny that motion. The defendants Robertson, Don Henery (Henery) and Wes Eisenbeiss (Eisenbeiss) have filed a motion for summary judgment against the plaintiffs. I will grant that motion in part and deny it in part.

## I. BACKGROUND

This is a case about a brawl and the actions of a deputy sheriff. Robertson, while performing his duties as a deputy sheriff for Knox County, was beaten by three or more people. Before, during or after that beating, Robertson struck Whipple with a baton, fired a shot at a car near to where she was standing, forced Owl to the ground at gun point, and shot Owl in the neck.

Eisenbeiss is the sheriff. Henery is the chief deputy. Neither Henery nor Eisenbeiss were involved in the melee involving Robertson, Owl and Whipple.

### A. The Issues

The plaintiffs describe their claims against Robertson this way:

The plaintiffs allege four separate violations of their Fourth Amendment rights by defendant Robertson. They contend that defendant Robertson, a deputy Sheriff in Knox County, Nebraska, denied Roxanne Whipple's and Dan

Red Owl's constitutional right to be free from unreasonable seizure:

(1) when he clubbed Roxanne Whipple with a police baton;

(2) when he fired his gun at or in the direction of Roxanne Whipple;

(3) when he physically seized Dan Red Owl, at gunpoint, and forced him to lay down on the ground; and

(4) when he shot Dan Red Owl.

(Plts' Br. at 2.)

As for Eisenbeiss and Henery, the plaintiffs claim they are personally liable because they did not properly train Robertson. (Filing 1 ¶ 19.) They also allege that these defendants are personally liable because they did not properly supervise Robertson despite being aware of facts "that made them know, or should have made them know, that the defendant Robertson presented a danger to the public." (*Id.* ¶ 20.)

The following issues are presented by the motions for summary judgment:

1. Did Robertson use excessive force when he struck Whipple with a baton, or conversely, is Robertson entitled to qualified immunity on this issue?

2. Did Robertson use excessive force when he shot at a car near to where Whipple stood, or, conversely, is Robertson entitled to qualified immunity on this issue?

3. Did Robertson use excessive force when he took Owl to the ground at gun point, or, conversely, is Robertson entitled to qualified immunity on this issue?

4. Did Robertson use excessive force when he shot Owl in the neck while Owl lay on the ground, or, conversely, is Robertson entitled to qualified immunity on this issue?

5. Are Henery or Eisenbeiss entitled to qualified immunity on the failure to train and supervise claims?

## B. Facts

Material facts are in dispute as to some issues. However, other material facts are not in dispute as to other issues. Viewed in the light most favorable to the plaintiffs, the material undisputed facts [1] are these:

### About Robertson

Robertson, like some of the other participants in this incident, is a Native American who resides on Santee Sioux tribal land in Knox County. As a deputy sheriff for Knox County, Robertson routinely patrolled this tribal land.

The incident that gave rise to this lawsuit took place at 2:45 a.m. on April 12, 1998. By that time, Robertson had been a deputy sheriff with Knox County for about 2 years.

Before joining the sheriff's office, Robertson had been a military police officer for 12 years. No one was ever hospitalized as a result of Robertson's behavior while a military police officer. Robertson received training in the use of "mace" while in the military.

Prior to the incident, and as required by Nebraska law in order to serve as a deputy sheriff, Robertson received extensive training. After completing about 13 weeks of study at the Nebraska Law Enforcement Training Center in Grand Island, Nebraska, Robertson was certified by the Nebraska Commission on Law Enforcement and Criminal Justice to perform duties as a law enforcement officer. After that, he also received other training. For example, he successfully completed the "PPCT Defensive Tactics System Basic Certification."

Robertson carried a .357 revolver. Other than qualifying on the shooting range, he received no special training in the use of that weapon while employed by Knox County.

When he was hired, Robertson was given a policy manual prepared by the sheriff's office. That policy manual included

1. The evidence is found at filing 15 and filing 22.

instructions about the use of firearms and when deadly force was permitted. As it regarded "deadly force," Robertson was instructed that he could use deadly force only "in the defense of his/her life or in the defense of the life of another." (Filing 15, Ex. 2A at 00044.) A deputy "may also use deadly force to effect the capture or to prevent the escape of a suspect if the Deputy has probable cause to believe that the suspect has committed a felony crime involving the use, or threatened use of deadly force and the suspect poses a significant threat of death or serious physical injury to the Officer or others." (*Id.*) Any use of a weapon required the officer firing the shot to verbally notify his superior and to submit a written report. (*Id.* at 00047).

Except for this incident, Robertson has never been the subject of a civil claim or suit brought against him involving the improper use of force. Save for this case, none of Robertson's employers have been the subject of a civil claim or suit involving an allegation that Robertson used excessive force.

Robertson was, however, involved in various matters that prompted administrative complaints. There is no evidence that those complaints were found to have had merit.

For example, prior to this incident, Robertson had been involved in one arrest where a person was injured. He arrested a man for obstructing another arrest. While the man was being taken into custody, his arm was broken when Robertson twisted it in an effort to place the man in handcuffs.

Robertson was also involved in a number of incidents where he used "mace" and administrative complaints were filed. These incidents resulted in no serious injuries.

Robertson was also the subject of an administrative complaint alleging that he had tried to sexually assault a female prisoner after an arrest. This incident was investigated but Robertson was not charged or disciplined.

## About Eisenbeiss and Henery

As noted earlier, Eisenbeiss is the elected sheriff and Henery is the chief deputy sheriff. Both men received the training mandated by the State of Nebraska in order to become police officers. Eisenbeiss is the only person who can hire, fire or discipline employees of the sheriffs office.

Neither Eisenbeiss or Henery were present at the scene of the incident that gives rise to this case. Likewise, neither man was consulted by Robertson in any way before or during the incident about how Robertson should handle it. After the incident, the Nebraska State Patrol, and not the Knox County Sheriff's Department, conducted the criminal investigation of the incident.

Both Eisenbeiss and Henery probably knew about the earlier case involving Robertson and the arrest that resulted in a broken arm. They also probably were aware of Robertson's earlier use of mace that involved no serious personal injuries. In addition, they probably knew about the sexual assault complaint that was investigated but which resulted in no discipline or criminal prosecution. However, both men have sworn that they were never aware "of any incident in which Deputy Robertson used excessive force in violation of an individual's constitutional rights." (Filing 15, Ex. 2, ¶ 7; Ex. 3, ¶ 7.)

## About the Incident

Whipple came to Robertson's home in the early morning hours of April 12, 1998. She told Robertson that Dave Henry (not to be confused with defendant Don Henery) had been injured. She asked Robertson to come to the "Basin" where the injury had occurred. The "Basin" is a public recreational area.

Before asking Robertson for help, Whipple, her friend and co-plaintiff Owl, and several other friends and family members had been at the Basin. Dave Henry and Robbie Henry (not to be confused with defendant Don Henery) were riding two

"three-wheeler vehicles." They ran into each other, and it appeared that Dave Henry might be hurt and needed medical attention.

After picking up an emergency medical technician, Robertson went to the Basin in his squad car. It was dark. Robertson was in uniform and armed. He encountered a number of people, including Whipple, Robbie Henry, Dave Henry, Michael Henry and maybe others. He also saw perhaps ten more individuals but they were not in the immediate vicinity.

The individuals that Robertson encountered smelled like they had been drinking. After being told no one was hurt, Robertson began to question Dave Henry about the accident. An argument ensued about whether Robertson had the authority to question Henry about drunken driving since he had not actually seen Henry drive. Whipple was among the people arguing with Robertson. These people were all standing in a semi-circle.

According to a statement given to the Nebraska Highway Patrol by Whipple on the date of the incident, "ROBERTSON ordered everyone to 'get back' two or three times." (Filing 15, Ex. 4, Nebraska State Patrol Interview Report regarding Roxanne Whipple at page 2.) No one followed Robertson's orders, and, specifically, Whipple admitted "that she did not get back and chose to 'put in my two cents worth.' " (Id.) The arguing continued with the crowd refusing to obey Robertson's order to "get back."

What happened next is largely in dispute. Also in dispute is the motivation of Robertson.

What is not in dispute is that Robertson used his mace, and he struck Whipple in the head with a baton causing a laceration that required seven stitches. It is also undisputed that Robertson was assaulted by Dave, Robbie and Michael Henry and perhaps others.

There is a dispute about whether Robertson provoked the assault by either firing his mace canister or striking Whipple with his baton for no reason. Robertson contends that he used the mace and baton only after he had been threatened by the crowd. The plaintiffs claim that the crowd did not threaten Robertson in any way.

Robertson asserts that he did not mean to strike Whipple in the head, but swung the baton at the legs of the crowd to move them back. There is also a dispute about whether Robertson used the mace before or after he struck Whipple with the baton.

During the fight, Robertson was knocked to the ground, and his head was covered with a jacket. He was severely beaten. The deputy was not sure of the identities of all the people who beat him. He lost his glasses as a result of the beating. He also lost his baton and mace. Although he is not sure who beat him, Robertson does not claim that Whipple or Owl assaulted him or attempted to assault him.

Robertson was able to regain his feet. He drew his weapon. At some point, he ordered everyone to get on the ground. No one complied.

Robertson fired his weapon at a yellow car, but the bullet did not strike anyone. Whipple was standing near or running towards the car when the shot was fired. After the shot, Whipple got in the yellow car. It was driven by Jimmy Henry. The car left the scene with Whipple in it.

Other people were running and failing to get on the ground. Using his radio, Robertson called for help. He continued to order everyone to get on the ground. He fired one shot over the head of an individual who was refusing to comply with his orders to get on the ground.

Robertson saw Owl. Owl was walking or running away. Other than walking or running away, Robertson does not claim that Owl resisted, threatened or attacked him. According to Robertson, Owl was "just walking around in a drunken stupor." (Filing 22, Ex. E at 46.) With his gun in hand, Robertson took Owl to the ground. Other than a skinned knee, and the loss of

his glasses, Owl suffered no injury when he was forced to the ground.

At that point, Robertson was either standing or kneeling by or over Owl. A second or two later, Robertson's gun discharged. The bullet struck Owl in the neck and exited under his chin. There is a dispute about whether the shooting was an accident.

Soon after he shot Owl, Robertson collapsed. Shortly thereafter, other police officers arrived. Robertson was taken to the hospital where he stayed until April 14, 1998.

### The Criminal Charges

This incident led to criminal charges against the plaintiffs and others. Whipple later entered a plea of guilty to disturbing the peace and was sentenced to four days in jail. Owl also entered a plea of guilty to disturbing the peace and he was fined $100. Deon LaPointe and Robbie Henry were sentenced to six months in jail or obstructing an officer. Michael Henry was placed on probation for 24 months for obstructing an officer.

### II. ANALYSIS

■ Government officials, like deputy sheriffs, who are sued for damages in their individual capacities under 42 U.S.C. § 1983 for their performance of discretionary functions are entitled to a qualified immunity defense if they prove that their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Qualified immunity is a question of law. To avoid subjecting officials to the distraction and deterrence of unnecessary trials, the Supreme Court has emphasized that summary judgment should be granted to a § 1983 defendant on qualified immunity grounds "if discovery fails to uncover evidence sufficient to create a genuine issue as to whether the defendant in fact violated clearly established law." *Johnson v. Boreani,* 946 F.2d 67, 69–70 (8th Cir. 1991) (quoting *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985)).

■ Resolution of the qualified immunity defense in the summary judgment context requires a step-by-step analysis. *See, e.g., Cross v. City of Des Moines,* 965 F.2d 629, 631–33 (8th Cir.1992) (reversing decision denying motion for summary judgment on qualified immunity grounds). First, the court must determine whether the plaintiff has alleged the violation of a constitutional right. *Id.* Second, the court must determine whether the right was "clearly established" at the time of the alleged violation. *Id.* Third, if the constitutional right was clearly established, the court must determine whether there are material facts in dispute regarding the objective reasonableness of the defendant's conduct in light of the law and the facts known to the defendant at the time. *Id.* Lastly, if the facts are undisputed, and the defendant could be found to have acted reasonably if the conduct is viewed objectively, then summary judgment must be granted for the defendant. *Id.*

■ For a right to be clearly established the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing is a violation of that right. Although the defendant bears the initial burden of coming forward with facts to suggest he was acting within the scope of his discretionary authority, the plaintiff must demonstrate that the law allegedly violated was clearly established. *Id.* If the plaintiff can show that the defendant's conduct as described by the plaintiff violated clearly established law, then it is the defendant's burden to demonstrate that no material issues of fact remain as to whether the defendant's actions were objectively reasonable in light of the law and the information the defendant had at the time of his actions. *Id.*

### A. The Excessive Force Claims

The Court of Appeals has recently explained how to evaluate excessive force

claims within the context of a qualified immunity defense when someone has been hit on the head or shot by a police officer:

Excessive force claims arising from arrests are analyzed under the Fourth Amendment, *Graham v. Connor*, 490 U.S. 386, 394, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), and the use of force is not constitutionally excessive if the "officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them." *Id.* at 397, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443. In applying this objective reasonableness standard, a court must pay close attention to the particular facts. It should consider such factors as the severity of a suspected crime, whether the suspect poses an immediate threat to the safety of the officer or others, and whether he is actively resisting or evading arrest. *Graham*, 490 U.S. at 396, 109 S.Ct. 1865, 104 L.Ed.2d 443. It may also be appropriate to consider the extent of any injury sustained by the suspect, *Foster v. Metropolitan Airports Comm'n*, 914 F.2d 1076, 1082 (8th Cir.1990), and standard police procedures, *Ludwig v. Anderson*, 54 F.3d 465, 472 (8th Cir.1995). As the Supreme Court has noted, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments— in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 397, 109 S.Ct. 1865, 104 L.Ed.2d 443. Critical decisions regarding the use of force often must be made without much time for reflection. The issue of reasonableness must be examined from the perspective of the facts known to the officer at the time of the incident. *Schulz v. Long*, 44 F.3d 643, 648 (8th Cir.1995). Deadly force is justified if the totality of the circumstances gives the officer "probable cause to believe that the [arrestee] poses a threat of

serious physical harm, either to the officer or others." *Tennessee v. Garner*, 471 U.S. 1, 11, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985).

*Nelson v. County of Wright*, 162 F.3d 986, 990 (8th Cir.1998) (deputy sheriff had qualified immunity where he struck an arrestee on the head with an asp and shot the arrestee in the chest; the encounter escalated rapidly, arrestee actively resisted arrest, arrestee reached for deputy's gun, and arrestee shoved deputy onto floor and into a closet; the deputy knew arrestee had been acting violently, had recently fled from a mental institution, and arrestee had taken pills).

In particular, when deciding the defense of qualified immunity in the context of an excessive force claim, a court must pay close attention to the specific facts. *Goff v. Bise*, 173 F.3d 1068, 1073–74 (8th Cir. 1999) (disputed facts regarding circumstances of arrest and degree of force used during arrest were questions for a jury and denial of summary judgment motion based upon qualified immunity was therefore proper). The "severity of the suspected crime, whether the suspect posed an immediate threat to the officer or others, and whether the suspect was actively resisting arrest" are especially important factors. *Id.*

### 1. Striking Whipple in the Head with a Baton

■ There is no doubt that it was clearly established that Whipple had a right to be free from excessive force under the Fourth Amendment even if she had violated the law.[2] *See, e.g., Goff*, 173 F.3d at 1072. Second, the act of striking Whipple in the head with a baton amounted to the use of deadly force. *See, e.g., Nelson*, 162 F.3d at 990 ("The parties agree that ... striking him on the head with an asp can be an application of deadly force....") Third, before using such lethal force, Robertson must have had reasonable (probable) cause to believe that the crowd posed

---

2. The same is true for Owl.

a serious threat of serious physical harm, either to Robertson or someone else. *Id.*

If Whipple, and the testimony of her friends, is believed, they did not threaten or menace Robertson or anyone else until he struck Whipple with the baton. In fact, Robertson makes no claim that Whipple did anything other than argue with him and refuse to step back. According to Whipple and her friends, while the crowd did not move when ordered to do so, they did not actively resist or attack either. Nothing about the then completed crimes (drunken driving of a "three wheeler" or refusal to step back) required hitting Whipple on the head.

On the other hand, if Robertson is believed, and he was confronted with an angry drunken mob that took steps to attack him, then the use of the baton was objectively reasonable. In fact, if Robertson is believed, he was simply swinging the baton at the legs of the crowd and inadvertently struck Whipple.

Under these circumstances, the cross motions for summary judgment on the use of the baton must be denied. Among other things, there is a genuine dispute of material fact about whether a reasonable police officer could have believed that the crowd had taken steps to attack him prior to his use of the baton.

### 2. Shooting at the Yellow Car

 Whipple now suggests that Robertson may have shot at her. However, the undisputed facts show that Robertson shot at the yellow car and not Whipple, who was nearby. (*E.g.*, filing 22, Ex. E at 38.)[3] Indeed, on the morning of April 12, Whipple told the Nebraska State Patrol that "she was headed toward a nearby car when she heard shots being fired" and "[s]he thought that the Deputy shot at the car...." (Filing 15, Ex. 4, Nebraska State Patrol Interview Report regarding Roxanne Whipple at page 2.)

As there was in fact no use of force, excessive or otherwise, visited upon or directed at Whipple when Robertson shot at the yellow car, there was no violation of Whipple's Fourth Amendment rights. In other words, there can be no "excessive force claim" unless some force was used on or directed at the citizen who claims her Fourth Amendment rights were violated. In addition, because there was no physical contact with Whipple when Robertson shot at the car and because she was able to and did leave the scene thereby not submitting to the general show of force, she was not seized for Fourth Amendment purposes. *See, e.g., Mettler v. Whitledge,* 165 F.3d 1197, 1203–04 (8th Cir.1999) (Sheriff's deputies did not seize suspect for Fourth Amendment purposes either by trapping him in a garage or by sending a police dog to locate him because there was no physical contact and the suspect did not acquiesce in the assertion of police authority). Because of these two undisputed facts (no contact with plaintiff and no acquiescence in the general show of force), summary judgment must be granted for Robertson since the Fourth Amendment was not violated when Robertson shot at the yellow car, and not at Whipple.

### 3. Taking Owl to the Ground with a Gun in Hand

 Owl claims that the force used to take him to the ground was excessive. It is undisputed that Robertson violently forced Owl to the ground at gun point. Owl suffered no serious injuries because he was thrown to the ground. It is also undisputed that Owl was trying to get away from Robertson. (Filing 22, Ex. D at 2 ¶ 6 (Owl stated: "I heard at least one gunshot. I believe I heard another gunshot shortly after the first shot. I turned around, away from the trouble, and started toward our truck. Everybody was running, trying to get away.")) Owl was not, however, actively resisting, threatening or

---

**3.** Question by plaintiffs counsel: "And you fired a shot at the yellow car, correct?" Robertson responded: "Yes."

attacking Robertson. It is further undisputed that Robertson had been beaten minutes earlier, lost his glasses, mace and baton, and, in the dark, was trying to quell a violent disturbance and take suspects into the custody.

Under these circumstances, Robertson's conduct was objectively reasonable. Robertson was in an extremely vulnerable position. He had just been beaten, and he was not sure of the identities of all the persons who had beaten him. He had lost his mace and baton. He glasses were gone. Robertson had probable cause to believe that at least two crimes had been committed in his presence, that is, the refusal of the crowd to obey his order to "step back" and the beating he had just suffered. Moreover, no one in the crowd was obeying his lawful order to get on the ground. Indeed, they were running away. Therefore, his effort, while literally in the dark, to quell a violent disturbance and apprehend potential suspects justified taking Owl to the ground at the point of a gun as he tried to run away. *See, e.g., Edwards v. Giles*, 51 F.3d 155, 156 (8th Cir. 1995) (officers were entitled to summary judgment on qualified immunity grounds; officer pursued speeding van; arrestee ran from officer after crash; officer found the unarmed arrestee, pointed a gun at him, and later threw him to the ground; arrestee's abdomen was cut when he struck the ground).

To the extent that Owl argues that Robertson provoked the incident by hitting Whipple or discharging a mace canister at the crowd, and thus nothing Robertson did to Owl can be justified under the Fourth Amendment, I disagree. Even if Robertson's "mace and baton" behavior was excessive, the undisputed wrongs committed by the crowd—the failure to step back, followed by the beating of the officer, and the subsequent refusal to obey a lawful order to get on the ground—provided Robertson with the right to exercise his law enforcement powers. *See United States v. Dawdy*, 46 F.3d 1427, 1431 (8th Cir.) ("[W]e now hold that a defendant's response to even an invalid arrest or Terry stop may constitute independent grounds for arrest"; holding that because the defendant resisted when officer tried to put handcuffs on him, even if the initial stop was invalid, officer had probable cause to arrest defendant for resisting arrest), *cert. denied*, 516 U.S. 872, 116 S.Ct. 195, 133 L.Ed.2d 130 (1995).

### 4. Shooting Owl in the Neck

■ Robertson admits that Owl was not actively resisting, threatening or attacking him when he shot the man. Robertson claims, however, that the shooting was an accident. In contrast, other people state the shooting was intentional. Owl swears that "[h]e shot me within a second or, at most, a few seconds after I hear him scream: 'I'm going to fucking blow your head off.'" (Filing 22, Ex. D at 4 ¶ 19.) Dan LaPointe, Jr. provides a similar story. (*Id.* Ex. B at 6 ¶ 26.) So does Becky LaPointe. (*Id.* Ex. A at 4 ¶¶ 14–15.)

The evidence is also undisputed that, prior to shooting Owl, Robertson had twice intentionally fired his weapon. One time he shot above a man's head. In this regard, Robertson's conduct in firing over the man's head apparently violated the Sheriff's policy manual. In Knox County, warning shots were prohibited. (Filing 15, Ex. 2A at 00047 ("An Officer is not justified in using his firearm to fire a warning shot.")).

With these factors in mind, it is obvious that the act of firing a bullet into someone's neck is the use of deadly force. *See, e.g., Nelson*, 162 F.3d at 990 ("The parties agree that ... shooting someone ... can be an application of deadly force....") Since Robertson admits that Owl was not actively resisting, threatening or attacking him, Robertson violated Owl's Fourth Amendment rights if, after seizing Owl, the deputy intentionally shot him. *Id.* ("A reasonable police officer would have known in October 1994 that ... deadly force would not be justified unless there was probable cause to believe he was faced with a threat of serious physical harm.")

On the other hand, if the shooting was truly accidental, then there was no violation of Owl's Fourth Amendment rights since the act of drawing the weapon and the act of forcing Owl to the ground were not, for the reasons given earlier, excessive under the Fourth Amendment. Therefore, the inadvertent discharge of the weapon could not be characterized as excessive either, even though Owl had been "seized" by Robertson when the gun was fired. This is because the Fourth Amendment protects citizens against willful shootings and not accidental, but otherwise reasonable, ones. *See, e.g., Dodd v. City of Norwich,* 827 F.2d 1, 7–8 (2nd Cir.1987) (concluding that there was no Fourth Amendment violation where the district court found that the police officer's act of pulling a gun was reasonable; it was undisputed that police officer drew his gun as he knelt over the suspected burglar while attempting to handcuff him; it was undisputed the officer accidentally shot the suspected burglar when, as the suspect reached for the gun, the officer instinctively reacted by pulling his hand and the gun away thus causing the gun to fire) (on reargument), *cert. denied,* 484 U.S. 1007, 108 S.Ct. 701, 98 L.Ed.2d 653 (1988).

In summary, there is a dispute of material fact about whether Robertson intended to shoot Owl. Therefore, the cross motions for summary judgment on the shooting of Owl must be denied. *See, e.g., Cardona v. Cleveland,* 129 F.3d 1263, 1997 WL 720383 (6th Cir.1997) (affirming district court's refusal to grant a motion for summary judgment based upon qualified immunity; a police officer claimed that the shooting of a suspect who had been taken to the ground by the officer at gun point was accidental, while other evidence suggested that the shooting was intentional) (table). *See also Otey v. Marshall,* 121 F.3d 1150, 1154–55 (8th Cir.1997) (district court denied summary judgment to police officer on qualified immunity grounds "because there remains the question of material fact of whether [the police officer] intentionally shot" a fleeing suspect who refused an order to stop; for purposes of evaluating qualified immunity defense of the police chief on a failure to train, supervise and discipline claim, the Court of Appeals presumed that if the officer intentionally shot a fleeing suspect who posed no threat, the Fourth Amendment would be violated).

## B. The Failure to Train and Supervise Claims

A superior's liability under the Constitution for the failure to train or supervise a subordinate law enforcement officer is very limited. *See, e.g., Otey,* 121 F.3d at 1155 (reversing denial of motion for summary judgment on qualified immunity grounds; police chief did not violate clearly established federal rights of which a reasonable person would have known when he allegedly failed to train, supervise and discipline an officer regarding use of excessive force after officer allegedly fired warning shots in violation of department policy and after police chief allegedly received other reports of excessive force). The elements of a typical failure to train or supervise claim are these: (a) the defendant received notice of unconstitutional acts committed by a subordinate; (b) the defendant demonstrated deliberate indifference to the offensive acts; (c) the defendant failed to take sufficient remedial action to train or supervise the offending subordinate; and (d) such failure proximately caused the injury. *See id.*

Section 1983 liability cannot attach to a supervisor merely because a subordinate violated someone's constitutional rights. *See City of Canton v. Harris,* 489 U.S. 378, 385, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989) (*"Respondeat superior* or vicarious liability will not attach under § 1983."). Rather, Eisenbeiss and Henery can be liable for Robertson's alleged constitutional violations only "if [they] directly participated in the constitutional violation, ... or if [their] failure to train or supervise the offending actor caused the deprivation...." *Tilson v. Forrest City Police Dep't,* 28 F.3d 802, 806 (8th Cir.1994), *cert. denied,* 514 U.S. 1004, 115 S.Ct. 1315, 131 L.Ed.2d 196 (1995) (citations omitted).

Even if the failure to train or supervise caused the harm, there still must be a showing that the supervisor was "deliberately indifferent" to the constitutional principles at stake. *See, e.g., Liebe v. Norton,* 157 F.3d 574, 579 (8th Cir.1998) (both a failure to train and failure to supervise claim require a showing of deliberate indifference).

 There is simply no evidence that either Eisenbeiss or Henery were "deliberately indifferent" to training or supervision needs. As for training, the undisputed evidence shows that Robertson was well trained. In addition to his general schooling with the military and at the Nebraska law enforcement training academy, Robertson was trained in the use of mace (while in the military) and in the use of defensive tactics (while employed by Knox County).

Still further, it is undisputed that Robertson was provided with a manual about the use of deadly force that mirrored Fourth Amendment standards. Given the absence of any contrary evidence, the manual proves that Robertson was properly trained in the use of deadly force. *Otey,* 121 F.3d at 1156 (emphasizing the significance of giving the subordinate police officer a policy manual regarding the use of deadly force; concluding that such evidence proved that the superior "had specifically trained [the subordinate officer] only to use deadly force in a manner consistent with the constitution").

 As for supervision, there is no showing that either Eisenbeiss or Henery were deliberately indifferent to the need for supervision. While the plaintiffs assert the existence of previous administrative complaints about Robertson, there is no showing that a reasonable supervisor in the shoes of Eisenbeiss or Henery would have concluded that those complaints had merit. In this regard, the "mere existence of previous citizens' complaints does not suffice" to give notice to superiors that they have a rogue police officer on their hands. *Mettler,* 165 F.3d at 1205 (15 complaints against 2 officers was not enough

where only one was partially sustained); *Otey,* 121 F.3d at 1155–56 (assuming that such a shooting was unwise, the fact that subordinate officer had fired warning shots at dance hall in violation of police department's manual was not enough to put chief of police on notice where there was no showing that constitutional rights were violated as a result of the shooting).

In summary, the undisputed evidence requires that the motion for summary judgment submitted by the sheriff and his chief deputy be sustained. On this record, a reasonable supervisor would not have understood that he was being deliberately indifferent to the need to train or supervise Robertson.

IT IS ORDERED that:

1. The plaintiffs' motion for summary judgment against Robertson (filing 21) is denied;

2. The summary judgment motion on the grounds of qualified immunity submitted by Robertson, Eisenbeiss, and Henery (filing 14) is denied except as follows:

(a) the motion is granted in favor of Robertson and against the plaintiffs providing that Robertson has qualified immunity from suit on the claims that (i) Robertson violated Whipple's Fourth Amendment rights when he shot at the yellow car; (ii) Robertson violated Owl's Fourth Amendment rights when he took Owl to the ground with gun in hand;

(b) the motion is granted in favor of Eisenbeiss and Henery and against the plaintiffs providing that those defendants have qualified immunity from suit on the claims that they failed to train or supervise Robertson.